736 S.W.2d 673 (1987)
Kavin Wayne LINCECUM, Appellant,
v.
The STATE of Texas, Appellee.
No. 69651.
Court of Criminal Appeals of Texas, En banc.
September 16, 1987.
*674 Robert J. Kuhn, Austin, for appellant.
Charles J. Sebesta, Jr., Dist. Atty., Caldwell, Larry P. Urquhart, Special Prosecutor, Brenham, Robert Huttash, State's Atty., Austin, for the State.
Before the court en banc.

OPINION
MILLER, Judge.
Appellant was convicted for the commission of capital murder. V.T.C.A.Penal Code, § 19.03. The jury answered the special issues in the affirmative and appellant was sentenced to death. On appeal appellant brings five points of error. We will affirm.
In order to dispose of several of appellant's points of error, a recitation of the facts disclosed at trial is necessary.[1] The indictment filed against appellant alleged that on August 11, 1985, while in the course of intentionally committing and attempting to commit the offense of kidnapping, robbery or aggravated sexual assault against Kathy Ann Coppedge, appellant intentionally caused her death by strangling her with panty hose, twine, a vinyl strap, and other means unknown to the grand jury.
Phillip Coppedge testified that he was married to Kathy Ann Coppedge and they had one son, Casey, who was born in 1976. The family moved to Brenham in November, 1984.[2] Kathy and Casey began attending the Brenham Presbyterian Church. Phillip did not attend regularly.
On August 10, 1985, Phillip, Kathy and Casey drove to Austin to shop for clothes. Kathy purchased a turquoise dress, and bought a pair of black Nike tennis shoes for Casey. They returned to Brenham on the same day and bought Casey two new shirts at a Beall's Department store. Kathy had taken $200.00 for her purchases and had spent only $60.00 for the dress. She would have been carrying the remainder of the cash when she attended church on Sunday.
On Sunday morning, August 11, 1985, Phillip left home at 6:30 a.m. to feed and ride his horse at a stable one mile from Brenham. When he returned home, Kathy and Casey were leaving for church in the blue Buick. Kathy was wearing her new dress, a watch that Phillip and Casey had given her for Mother's Day, earrings, a necklace, a wedding band with a large diamond in it, a diamond and ruby ring, a "pinkie ring" made from a set of diamond earrings, and a gold wedding band which had belonged to Kathy's mother. Casey was wearing his new Nike tennis shoes and one of the new shirts purchased the day before. While Kathy and Casey attended church, Phillip went to the Hughes Tool Company office in Brenham to clean it up. He returned just before noon to wait for Kathy and Casey to get back from church. When they failed to return on time, Phillip drove around the town in an attempt to locate them. He phoned the pastor of the Presbyterian Church, the two local hospitals, *675 and the police department. Finally, in a late afternoon conversation with the pastor's wife, he learned that a church member had reported activity which led Phillip to believe that Kathy and Casey had been kidnapped. Phillip phoned the Brenham Police Department to report that he feared his wife and child had been abducted. Later that evening, the church pastor and two police officers came to his home to tell him that Kathy and Casey were dead.
Tom Currie was the pastor of the Brenham Presbyterian Church. He testified that Kathy joined the church in December, 1984, and Casey was admitted as a member on Easter Sunday, 1985. On the day of the murder, Currie presided over the church service. Kathy and Casey were present, sat on the back row of the church, and were among the first persons to leave at the end of the service. After church, Currie spoke briefly to them as they walked out of the church.
A short time later, another church member, Edith Fahrenkamp, approached Currie and reported seeing a car containing a white woman and one or two black men leave at a high speed from the parking lot across the street from the church.[3] She thought she heard the woman call out for help. Currie asked another church member to call the police. An officer came by the church and was given the information provided by Fahrenkamp, which included a partial license plate number of the car.
Edith Fahrenkamp testified that she and her husband attended church on August 11, 1985. They sat on the next to last row at the back of the church and were among the first to leave at the end of the service. She did not know Kathy or Casey. After leaving the church, she and her husband walked to the parking lot across the street from the church. As she and her husband were about to get into their car, a car "just whizzed right behind" them out of the parking lot. At the same time, she heard "a call for help" and looked up to see the car driving down the street. The car was blue. Fahrenkamp observed "a black driving it and this white face with a black hand pulling the face down toward something black on the passenger side."[4] She tried to see the license plate and believed part of it read "227."[5] Fahrenkamp walked back to the church and gave Currie the information.
Ora Edwards also attended church services on August 11, 1985. She testified that she sat on a pew near the rear of the church. After the service ended, she left the church building and walked to her car, parked across the street. As she was entering her car, another car drove past her very quickly. Looking up, she observed a black man was driving the car and two other persons were seated on the front seat. She heard someone from the car scream "Help me." She entered her car and left.
Valeria Oevermann testified that in the late afternoon of August 11, 1985, she drove with her husband to the home of her parents situated west of the town of Burton, which is located 13 miles west of Brenham on Highway 290. She drove from Brenham to Burton on Highway 290 and then turned off the old 290 Highway on the west side of Burton. She then turned off the old highway onto a dirt road which led to her parents' house. She stated that the old 290 Highway runs parallel to the present Highway 290, which is much lower in elevation than the older highway. Someone driving on the present Highway 290 could not see a parked car on the north side of the old 290 Highway.
Oevermann testified that as she drove to her parents' house, at about 4:00 p.m., she noticed a car parked beside the old highway. Later, when she was driving down the same road in the opposite direction to go home at about 7:00 p.m., the same car was still parked in the same location. She noticed that the license plate bore the letter *676 "Z." After returning home to Brenham she watched the news and saw a bulletin regarding a kidnapping. She listened to a local radio station and heard the same report. She then called the police and reported the location where she had seen the car, which was similar to the one mentioned in the bulletin.
Jay Petrash, a patrolman in the Brenham Police Department, testified that he and other officers drove to the location where Oevermann had reported seeing the car. They found the Coppedge vehicle parked in a ditch on the side of the old 290 Highway. The windows were rolled up, the car was locked, and the trunk was closed and locked. The officers searched the car, and found bodies of the victims in the trunk.
Petrash testified that Casey and Kathy were bound behind their backs with a vinyl cord. A length of twine with a loop tied in one end was found lying loose in the trunk underneath the bodies. Kathy's dress and bra were ripped. Her panties were found beneath her legs. The shoes of the victims were missing. No purse, cash, or jewelry were found in or near the car. Petrash testified that August 11, 1985 had been a very hot day and that the temperature had reached above 100 degrees Farenheit.
Other officers testified that appellant was arrested with two other men in Hallettsville on December 3, 1985, for an unrelated offense which had occurred on the same day as the murders in Fayette County. One of the men with whom appellant was arrested went with officers to his residence in a rural area in Lee county. Appellant's brown Chevrolet vehicle was parked beside the house. A search revealed a lock blade knife in the glove compartment and a photograph of appellant and Rita Mathis, his girlfriend.
After searching appellant's car, the officers drove to Rita Mathis' house. Officers spoke with Rita and her father, and requested the items that appellant had given Rita. She then removed Kathy Coppedge's watch from her wrist and two of Kathy's rings. She produced from her purse the other two rings taken from Kathy at the time of the murder.
Rita was taken to the Fayette County Sheriff's office where appellant was being held. After obtaining a statement from Rita regarding her acquisition of the jewelry, appellant was questioned about the murders. He initially denied any knowledge regarding the Coppedge murders, but when showed the jewelry recovered from Rita, he agreed to give a statement.
The statement was introduced by the State at trial, with certain portions deleted,[6] and read as follows:
"Both prior to and during the making of this statement, I voluntarily, intelligently and knowingly waive all of the above described rights, and I freely and voluntarily make this statement without any threats or promises having been made to me by anyone.
During this past summer on a Sunday morning, I left my home at route 1, Box 67, Ledbetter at about 4:30 a.m., and walked to Brenham. When I got to Brenham, I went to the H.E.B. Store and walked around the store and ate some grapes and small fruit.
I went out and walked around some more and finally got to the Catholic church and was talking to a lady in the front of the church. The priest came out of a house by the church and asked me what I was doing. I told him I was looking for directions to a muffler shop. He told me where he thought it was.
When I left there I walked around some more and wound up at a church near the college on Jackson Street. I went to Jackson Street Park and then back to the church parking lot across the street from the church.
I was walking toward the cars on the parking lot when I saw a lady and a little boy go to a blue car. I walked past them and then made a "U" turn back and she had gotten into the car. I told her to *677 slide over and I drove off with all three of us in the front seat.
I went about 2 blocks and turned right and followed that street to U.S. 290 and turned left and toward Burton.
About 4 or 5 miles out I turned off 290 to the right on a gravel road. I drove about a mile on the gravel road and stopped in the road.
I went through her purse and got what money she had. I told the boy to get in the back seat and he asked me not to hurt his Mama and I told him I wouldn't hurt her. I told her to get out and pull her clothes off. Then we got back in the car. She picked up my knife, a K-Bar folding lock blade, and stabbed me in my left side. I took the knife from her and folded it up. I told her son to get back in the front seat and I tied his hands with the strap off her purse. I then put him in the trunk of the car. I then got back in the car, threw away her purse, shoes and panty hose. I got her out and told her to walk to the back. She put her dress back on before we got out. When we were out and at the back of the car I told her to put her hands behind her back and I tied them with part of the strap from her purse.
Right after she stabbed me I wrapped her panty hose around her throat and choked her.
After I tied her hands [].
I shut the trunk on a vacuum cleaner and tied it with her belt. I then backed to U.S. 290 and went towards Burton. I drove to where I left the car and took the vacuum from under the trunk lid and shut the trunk down. I shut the trunk [].
I walked toward Burton carrying the boys [sic] black tennis shoes. I walked by the ball park and into Burton. []. When I got to the bank, I turned left and walked north past the High School and took the road to the left and at the next fork in the road I took the right hand road and went to my Auntie's house where I was staying.
I took the rings, about 6 and the watch and put them in the floorboard of my car which was in front of the house on blocks. My car was disabled but locked up.
I took 4 or 5 rings from the lady I left in the trunk of the blue car. I also took her watch.
I later gave all the rings and the watch to my girl friend.
On Monday or Tuesday, I went to a doctor in Giddings and he treated the stab wound. He x-rayed the wound, put a tube in, and dressed the wound. The tube stayed in for about 2 weeks. I paid him $52.00.
On the day of this incident I was wearing blue jeans and a black sleeveless pull-over shirt "Harley Davidson" on the front, high top white tennis shoes and white cowboy type straw hat.
I went to the 10th grade in school. I can read and write the English language.
I am signing this statement freely and voluntarily without any promises or threats to me from anyone.
Rita Mathis testified at trial that appellant gave her the watch and the four rings she turned over to the police. She recalled that appellant gave her the jewelry sometime between Thanksgiving and the night the officers came to her house.
Sheriff Rosembaum, who had been involved in the investigation, testified that a few days after appellant confessed to the Coppedge murders, the Nike tennis shoes taken from Casey were recovered from Marcus Handcock, who worked in Brenham. He testified that in the fall of 1985, both he and appellant were living in the home of Eula Belle Moore. Sometime in September or October of 1985, appellant sold him the Nike tennis shoes.
Patricia Hulen, a forensic serologist in the Department of Public Safety Crime Lab in Austin, testified that her analysis of the dress Kathy Coppedge was wearing at the time of her death disclosed the presence of male seminal stains all over the inside of the skirt part of the dress, both on the front and back sides. Testing on some of the seminal stains disclosed the presence of blood antigen B. Appellant's blood type was A2B. A male person of this blood *678 type could deposit the blood antigen B in his semen.
Warren Harteley, foreman of the grand jury which returned the indictment charging appellant with capital murder made a statement which was admitted at trial by stipulation. In the statement, Harteley indicated that after utilizing reasonable diligence and having before the grand jury all of the information known to the prosecution, the grand jury could not determine the instrument used to cause the death of Kathy Coppedge. Moreover, additional investigation by the grand jury would not have determined with certainty the instrument that was used.
Aurelio Espinola, the chief deputy medical examiner for Harris County, testified regarding the post mortem examination conducted on the body of Kathy Coppedge. He stated that both her dress and bra were torn and she was not wearing panties. External examination disclosed the presence of ligature marks around her neck which were described as impressions produced by "something elongated like a cord or some material of that nature." He testified that the external and internal examination disclosed the cause of death to be asphyxia due to ligature strangulation. He added that the physical findings disclosed that the ligature used to strangle Kathy was held tightly around her neck for an unusually long period of time. Espinola testified that Kathy would have lost consciousness following about three minutes of continuous strangulation; however, the ligature was held tightly around her neck for approximately three minutes thereafter.
Espinola disputed appellant's use of panty hose to strangle Kathy. Also, he stated that it was possible, but unlikely, that the vinyl straps used to tie the hands of Kathy and Casey were also used to strangle her. He believed that the length of bailing twine found under the bodies in the trunk of the car was probably the ligature used.
Espinola briefly described his post mortem examination of Casey, and believed that Casey was alive when placed in the trunk but died within about four minutes of asphyxia due to suffocation.
Espinola testified that Kathy, Casey's mother, could not have walked around to the back of the car and entered the trunk. In his opinion she died from ligature strangulation, rather than suffocation, and was already dead when placed in the trunk of the car.
In his first point of error, appellant contends that the trial court erred in failing to submit a charge to the jury on voluntary manslaughter. Appellant submitted an instruction on voluntary manslaughter and sudden passion, both of which were refused by the trial judge. The jury was charged only on capital murder.[7]
Appellant argues that the trial court erred because appellant acted under the immediate influence of sudden passion arising from an adequate cause as evidenced by the statements in appellant's confession that Kathy had stabbed him with a knife. Thus, there is evidence that appellant killed Kathy suddenly and without thought as a reaction to her stabbing him in the side.
In Godsey v. State, 719 S.W.2d 578 (Tex. Cr.App.1986), at 584, we set forth the rule for determining whether a charge on a lesser included offense should have been given:
"The two step analysis ... requires first, that the lesser included offense be included within the proof necessary to establish the offense charged; and second, there must be some evidence in the record that if the defendant is guilty, he is guilty of only the lesser offense. Royster v. State, 622 S.W.2d 442 (opinion on rehearing) (Tex.Cr.App.1981)."
Thus, to merit a jury instruction on a lesser included offense, the requested offense must be a lesser included offense of the offense charged, and the evidence must *679 show that if guilty, the defendant is guilty only of the lesser included offense.
For the sake of argument, we will assume the first requirement is met and will focus on the evidence showing, or not showing, the second requirement. Appellant argues that the statement in his confession that Kathy stabbed him with his knife is sufficient to establish sudden passion arising from adequate cause.
In order to establish the offense of voluntary manslaughter, the evidence must show that the murder was committed under the immediate influence of sudden passion arising from adequate cause. V.T.C. A.Penal Code, § 19.04. "Sudden passion" is defined as passion arising out of provocation by the victim at the time of the offense. V.T.C.A.Penal Code, § 19.04(b). "Adequate cause" is defined as cause which would commonly produce a degree of anger, rage, resentment or terror in a person of ordinary temper sufficient to render the mind incapable of cool reflection. V.T. C.A.Penal Code, § 19.04(c).
Initially, we will assume for the sake of argument that appellant experienced sudden passion after he was stabbed by Kathy. We will therefore focus our examination on whether there was "adequate cause". The evidence clearly shows that appellant had abducted Kathy and her son from the church parking lot, Kathy had been robbed and appellant had at least attempted to sexually assault her. Clearly, her acts in stabbing appellant were justified in self-defense and in defense of her son. See Penry v. State, 691 S.W.2d 636 (Tex.Cr.App.1985) and Goff v. State, 681 S.W.2d 619 (Tex.App.Houston [14th], 1983), affd. at 720 S.W.2d 94 (Tex.Cr.App. 1986). Under the facts of this case, appellant may not claim that Kathy's acts in self-defense gave rise to adequate cause so that he was justified in killing her, even if he was acting under sudden passion after the stabbing. Thus, the issue of voluntary manslaughter was not raised by the evidence.
Since the issue was not raised, appellant has not shown that the evidence established that if he was guilty, he was guilty only of voluntary manslaughter. The trial court did not err in refusing appellant's requested charge. See generally Marquez v. State, 725 S.W.2d 217 (Tex.Cr.App.1987). See also Bradley v. State, 688 S.W.2d 847 (Tex.Cr.App.1985). Appellant's first point of error is overruled.
In his second point of error, appellant contends that the trial court erred in instructing the jury on the aggravated offenses of robbery, kidnapping and aggravated sexual assault since there was no evidence to warrant the instruction. Basically, appellant argues that the evidence is insufficient to support the verdict. We will address separately each of the three alleged offenses which raised the offense to capital murder.
Initially, when we review the sufficiency of the evidence supporting a conviction, we must use the following standard:
"... [W]hether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . . [citations omitted.] The evidence must be viewed in the light most favorable to the verdict. . . . We apply this standard by determining whether the evidence supports an inference other than the guilt of the appellant."
Brandley v. State, 691 S.W.2d 699 (Tex.Cr. App.1985), at 703. See also Fierro v. State, 706 S.W.2d 310 (Tex.Cr.App.1986), and cases cited therein at 313, Bush v. State, 697 S.W.2d 397 (Tex.Cr.App.1985), Anderson v. State, 701 S.W.2d 868 (Tex.Cr. App.1985), and Carlsen v. State, 654 S.W.2d 444 (Tex.Cr.App.1983).
First, we will address the evidence showing commission or attempted commission of a kidnapping. A person commits the offense of kidnapping if he intentionally or knowingly abducts another person. V.T.C.A.Penal Code, § 20.03. "Abduct" is defined as restraining a person with intent to prevent his liberation by secreting the person in a place where he is not likely to be found, or using or threatening to use deadly force. V.T.C.A.Penal Code, V.T.C. A.Penal Code, § 20.02(2).
The record shows that Kathy and her son went to church but never returned. Witnesses *680 observed a car driving away from the parking lot at a high rate of speed. Another witness later saw the car parked on an isolated road in a rural area at a point where the car could not be seen by persons driving on the new U.S. 290 Highway. Both victims had been placed in the trunk of the car. We find that this evidence was sufficient to support a rational trier of fact's finding that a kidnapping had been committed. See Fann v. State, 696 S.W.2d 575 (Tex.Cr.App.1985) and Young v. State, 419 S.W.2d 864 (Tex.Cr.App.1967).
Second, we will address the evidence showing commission or attempted commission of robbery. A person commits robbery if, in the course of committing theft and with intent to obtain or maintain control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another or places another in fear of imminent bodily injury or death. V.T.C.A. Penal Code, § 29.02. Appellant argues that since there was no evidence that the money or jewelry were taken at a time when appellant had threatened to cause bodily harm or placed Kathy in fear of imminent bodily harm, the offense of robbery was not shown. Appellant misconstrues the law.
In Riles v. State, 595 S.W.2d 858, 862 (Tex.Cr.App.1982), this Court stated:
"The phrase, `in the course of committing or attempting to commit ...' as used in Sec. 19.03(a)(2), supra, is not defined in the Penal Code. Section 29.01(1) of the code, however, does define `In the course of committing theft.' That phrase is given the definition of `conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of the theft.' We similarly construe the phrase of Sect. 19.03(a)(2) to mean conduct occurring in an attempt to commit, during the commission, or in immediate flight after the attempt or commission, i.e., in this case, of robbery."
In Fierro, supra at 313, we also stated:
"Thus, a robbery of the victim immediately after the shooting of the victim resulting in his death is capital murder occurring in the course of committing robbery.
The fact that there was no prior discussion of robbery and no indication of an intent to commit robbery mentioned in the confession is not controlling. It is true there was no evidence that appellant demanded of the victim money or property prior to shooting him, but a verbal demand is not the talisman of an intent to steal. Such intent may be inferred from actions or conduct."
See also Demouchette v. State, 731 S.W.2d 75 (Tex.Cr.App.1986).
The confession given by appellant to the police indicates that he took the money and jewelry from Kathy. The evidence also clearly establishes that appellant killed Kathy and her son. There is sufficient evidence to support the jury's finding that a robbery was committed.
Last, we will consider the evidence to support the jury's finding on the sexual assault issue. Appellant argues that the evidence is insufficient because the State did not prove a completed sexual penetration, and because the sexual assault, if any, occurred at a different time than the bodily injury. Initially, the indictment in the instant case alleged that appellant murdered Kathy Coppedge "while in the course of committing or attempting to commit" aggravated sexual assault. When the victim's body was found, the front of her dress was torn and her bra was broken apart in front. Panties were found underneath the body in the trunk. The serologist who analyzed the dress found seminal stains on the front and back of the inside of the skirt, and testified that appellant's blood type could be connected with those stains. In appellant's confession, he admits that he drove Kathy and her son to a remote area and told Kathy to disrobe outside of the car. Since the State alleged in the indictment that appellant committed the murder in the course of committing or attempting to commit aggravated sexual assault, it is of no import that actual sexual penetration was not shown.
*681 Also, we are not persuaded by appellant's argument that the sexual assault took place at a different time than the murder. In Wooldridge v. State, 653 S.W.2d 811 (Tex.Cr.App.1983), this Court considered a case where the defendant had intercourse with the victim, then later killed her. He was charged with capital murder, to wit: murder committed in the course of sexual assault. We stated, "Moreover, we believed that this is the very conduct the Legislature sought to proscribe as a capital offense in § 19.03(a)(2),...." Id. at 816. Based on the evidence, we find that a rational trier of fact could have found that appellant did commit the murder while in the course of attempting to commit aggravated sexual assault.
Viewing the evidence in the light most favorable to the verdict, we find that the State presented sufficient evidence to support the jury's finding of guilt. Appellant's second point of error is overruled.
In his third point of error, appellant contends that the trial court erred in not submitting appellant's requested charge on the lesser included offense of murder. In Cordova v. State, 698 S.W.2d 107 (Tex.Cr. App.1985), this Court stated:
"The fact that the State in proving capital murder may also have proved a lesser offense does not entitle a defendant to a charge on the lesser offense."
As we stated earlier, in order to merit a charge on a lesser included offense, the defendant must show that the lesser included offense must be established within the proof necessary to establish the charged offense, and there must be evidence that the defendant, if guilty, is guilty only of the lesser included offense. We find no evidence in this record that appellant was guilty of only the lesser included offense of murder. Appellant's third point of error is overruled.
In his penultimate point of error, appellant contends that the trial court erred in failing to exclude extraneous offenses committed by the appellant because they lacked relevance and only prejudiced the jury. Appellant refers to the evidence concerning the murder of Casey Coppedge, Kathy Coppedge's son.
The record shows that during one of the officer's testimony, the State proved the condition, location, and position of the body of Casey Coppedge, as well as that of his mother. Photographs depicting the bodies inside the trunk of the car were admitted into evidence without objection. Appellant did not challenge the admission of evidence relating to Casey's death until Espinola, the medical examiner, testified.
Casey and his mother were murdered by appellant in the same course of events. The circumstances surrounding the boy's death were closely interwoven with those surrounding Kathy's death. In Archer v. State, 607 S.W.2d 539, 542 (Tex.Cr.App. 1980), this Court stated:
"Where an offense is one continuous transaction, or another offense is part of the case on trial or blended or closely interwoven, proof of all such facts is proper. Such an extraneous offense is admissible to show the context in which the criminal act occurred, ... [given] that the jury has a right to hear what occurred immediately prior to and subsequent to the commission of the act so that they may realistically evaluate the evidence."
Admission of such acts is especially compelling in a capital murder with multiple victims. See Mann v. State, 718 S.W.2d 741 (Tex.Cr.App.1986) and Self v. State, 513 S.W.2d 832 (Tex.Cr.App.1974).
In the case at bar, appellant did not object to the introduction of information regarding Casey's murder until the medical examiner testified. Prior to that time, information concerning the extraneous murder of Casey had been presented to the jury. Even if appellant's objection had been timely, the jury was entitled to know "the unfolding of events and the progression of the crime" which was necessary for a full picture of the crime. See Mann, supra at 744. The trial court did not err by admitting the evidence regarding the boy's murder. Appellant's fourth point of error is overruled.
*682 In his fifth and last point of error, appellant contends that there is insufficient evidence to sustain appellant's conviction for the offense of capital murder since the State failed to disprove the existence of sudden passion. We agree that had the issue been raised, the State would have been required to disprove sudden passion beyond a reasonable doubt. Bradley, supra.
In our disposition of point of error number one, however, we held that appellant was not entitled to a jury instruction on voluntary manslaughter because of sudden passion based on adequate cause. Therefore, the State did not have to disprove its existence beyond a reasonable doubt. Appellant's fifth point of error is overruled.
The judgment of the trial court is affirmed.
CLINTON, J., concurs in result.
NOTES
[1] Appellant did not include a statement of facts in his brief. We borrow liberally from the State's recitation of facts.
[2] The offense took place in Washington County but was tried in Brazoria County on an agreed motion for change of venue.
[3] This parking lot was used by church members on Sunday mornings.
[4] The shirt Casey was wearing that day was dark in color.
[5] The license was later shown to bear the letters "ZZT," which Fahrenkamp may have mistaken for the numbers "227."
[6] The deleted portions of the statement which were not presented to the jury will be represented in this text by closed brackets [ ].
[7] The jury was given the third special issue listed in Art. 37.071, V.A.C.C.P., regarding whether the defendant's conduct was unreasonable in response to provocation, if any, by the deceased during the punishment phase of trial. This issue was answered in the affirmative by the jury.