Amos L. HOSEY, Appellant,

v.

The STATE of Texas, Appellee.

No. 13–87–185–CR.

Court of Appeals of Texas,
Corpus Christi.

Nov. 3, 1988.

Juan Martinez Gonzales, Beeville, for appellant.

Wiley L. Cheatham, Dist. Att., Cuero, for appellee.

Before BENAVIDES, UTTER and DORSEY, JJ.

## OPINION

BENAVIDES, Justice.

Appellant, Amos Hosey, the appellant, was convicted by a jury of aggravated robbery and sentenced to 99 years' imprisonment together with a $9,000 fine. Appellant presents ten points of error for review. We set aside the judgment and remand the cause to the trial court due to error which occurred in the punishment phase of trial.

By his first two points of error, appellant asserts that his conviction for aggravated robbery was in violation of the prohibitions against double jeopardy under the Constitutions of the United States and Texas. The record reflects that the appellant had been previously convicted by a jury of attempted capital murder and sentenced to forty years' imprisonment. Both the indictment for attempted capital murder and aggravated robbery arose out of the same incident which involved the shooting of a state game warden. Appellant contends that the subsequent prosecution for aggravated robbery was barred since the same factual issues had been previously litigated in the attempted capital murder trial.

The indictment which charged the appellant with attempted capital murder alleged that:

> [Defendant] with the specific intent to commit the offense of Capital Murder, attempt to cause the death of VELTON WILLIAMS by shooting the said VELTON WILLIAMS with a handgun; and the said *VELTON WILLIAMS was then and there a peace officer who was acting in the lawful discharge of an official duty; and the said Defendant then and there knew the said VELTON WILLIAMS to be a peace officer* ... (emphasis added).

The indictment for the aggravated robbery alleged the following:

[Defendant], while in the course of committing theft and with intent to obtain and maintain control of property of VELTON WILLIAMS to wit: one (1) revolver, one (1) belt, one (1) cartridge loop, one (1) holster, one (1) handcuff case, eighteen (18) rounds of ammunition, one (1) set of handcuffs, one (1) rifle with scope, one (1) knife, and one (1) set of car keys, without the effective consent of the said VELTON WILLIAMS and with intent to deprive the said VELTON WILLIAMS of said property, *did then and there, by using and exhibiting a deadly weapon, to wit: a handgun, intentionally and knowingly cause bodily injury to VELTON WILLIAMS by shooting the said VELTON WILLIAMS with said handgun.* (emphasis added).

■■■■ The constitutional prohibition against double jeopardy protects against a subsequent prosecution for "the same offense" after conviction. *Ex Parte Peterson,* 738 S.W.2d 688, 689 (Tex.Crim.App. 1987). We are asked to decide whether, under the facts presented, the offense of aggravated robbery is "the same offense" as attempted capital murder. We decline to do so because the plea of double jeopardy was prematurely filed. "A plea of double jeopardy that is based on a prior conviction, to be successful, must be supported by a final conviction; otherwise, the plea is prematurely filed." *Johnson v. State,* No. 0733–86 (Tex.Crim.App.—Sept. 21, 1988) (not yet reported) [citing *Ramirez v. State,* 147 Tex.Crim.R. 218, 179 S.W.2d 973 (Tex.Crim. App.1944)]. The judgment of the trial court wherein appellant was convicted of the attempted capital murder of Velton Williams, was appealed, set aside, and remanded in an unpublished opinion by this Court. Petition for discretionary review was refused by the Texas Court of Criminal Appeals on October 12, 1988. It is obvious that when appellant was tried in this cause, his conviction for the former cause was not final, nor has such conviction become final. Because appellant's double jeopardy arguments are premature, we overrule appellant's first two points of error.

■■■■ By his third point of error, appellant contends that the State failed to prove that Velton Williams was acting in the lawful discharge of his duties when the incident occurred. This point of error is without merit. Under the robbery statute, Tex.Penal Code Ann. § 29.02 (Vernon 1974), the State was not required to prove that Velton Williams was a peace officer acting in the lawful discharge of his official duties at the time he was robbed, nor is such an element necessary under § 29.03 to elevate the robbery to an aggravated robbery. Moreover, the court's charge did not place this additional, unalleged burden on the State, thereby requiring it to be proved. *See Boozer v. State,* 717 S.W.2d 608 (Tex.Crim. App.1984). We overrule appellant's third point of error.

Appellant contends, by his fourth point of error, that the evidence was insufficient to establish the appellant's guilt beyond a reasonable doubt. We should note initially, appellant generally challenges the sufficiency of the evidence and does not specifically set forth his complaint.

The standard for review of the sufficiency of the evidence, whether circumstantial or direct, is whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Johnson v. State,* 673 S.W.2d 190, 195 (Tex. Crim.App.1984); *Wilson v. State,* 654 S.W. 2d 465, 471 (Tex.Crim.App.1983).

■■■■ The elements of aggravated robbery as defined by Tex.Penal Code Ann. 29.03(a)(1) and (2) (Vernon 1974) and as alleged in the indictment, and set forth in the court's charge, are as follows:

(1) a person;

(2) while in the course of committing theft;

(3) with the intent to obtain and maintain control of property;

(4) intentionally and knowingly caused serious bodily injury to another;

(5) by using and exhibiting a deadly weapon.

Appellant and his son, George, had been evading arrest for approximately six months prior to the occurrence in question. On September 28, 1985, Velton Williams, a State Game Warden, was traveling in his "marked" patrol vehicle down Highway 59 toward Goliad, Texas. He drove past appellant's place of business, "Hosey's Garage," and observed appellant and George. Williams, aware of the outstanding arrest warrants, turned around. By the time he arrived at appellant's garage, appellant and George were gone. Williams then asked Lillieve Hosey, appellant's wife, if appellant and George were on the premises. Mrs. Hosey told Williams that appellant was not on the premises and ordered Williams to leave. Williams began to back out of the driveway when he observed appellant and George run across the highway and jump into some bushes. Williams then attempted to contact the Sheriff's Department on his radio, but received no response. He, then drove across the highway in pursuit of the appellant. He had stopped his vehicle to "clear a ditch," when appellant jumped out of the bushes and ran up to the driver's side of the vehicle. According to Williams, appellant without saying a word, stuck a gun through the open window. Williams managed to raise his hand and grab appellant's gun before appellant fired the weapon. Williams testified that, as a result of this quick action, the bullet went through the knuckle of his middle finger on his left hand and across his chest, instead of directly through his chest to his heart.

After he was shot, Williams managed to get out of the vehicle while continuing to struggle with appellant over the gun. During this struggle, George began to hit Williams with a "silver-looking" object. Williams then saw Jackie Branch, a friend of his, driving down the highway in a pickup truck pulling a trailer and a boat. Branch pulled over on the side of the highway. Williams, trying to escape, managed to push appellant back and ran behind his patrol car. He then ran to the pickup, jumped into its bed, and quickly drove off.

At trial, Williams testified that inside his vehicle was a Smith and Wesson .357 Magnum, a Ruger belt, handcuff case and handcuffs, a cartridge carrier with approximately twelve bullets in it, a puma knife, a holster, a .22 rifle with a $3 \times 9$ Leopold scope on it, and car keys to the patrol car. Williams testified that after he jumped into the bed of the truck, he looked back and saw the appellant with his .357 Magnum and Ruger belt. He also observed George carrying his .22 rifle. According to Williams, all the items listed above, which had been located in his vehicle, were taken and never recovered.

Larry Newmann and Homer Brown testified that on September 28th they were traveling together down Highway 59 towards Victoria when they saw the appellant and George run across the highway and hide "in some weeds." They then observed a Texas Parks and Wildlife Vehicle cross the highway in pursuit of the two individuals.

Newmann testified that they pulled over onto the shoulder of the road where he and Brown witnessed appellant reach inside the window of the game warden's vehicle and struggle with him. According to both Newmann and Brown, the warden somehow got out of the car while appellant was still beating him. Thereafter, the warden broke free and ran toward a pickup truck parked on the side of the highway. The warden then jumped into the bed of the truck and the driver quickly drove off.

During cross-examination, Brown testified that he was unable to see if appellant had a weapon when he approached the warden's vehicle. He did, however, see the warden bleeding when he jumped into the pickup. Likewise, both men testified that they did not see appellant enter the warden's vehicle; however, immediately after the warden's escape, they saw appellant with a "silver looking pistol" in his hand and George with a rifle. According to Brown, appellant and George then walked across the highway and went inside the garage carrying these weapons. The two witnesses then left the scene to check on the warden's condition. Brown testified that when they arrived at the hospital, he heard Williams say "Amos shot me."

Dr. John Wright, Williams' treating physician, testified that when Williams arrived at the hospital, he stated that appellant had "pushed a pistol through his window," shot him, and took his service revolver. Wright also remembered Williams mentioning a rifle. According to Wright, Williams had suffered serious injuries as a result of the gun shot wounds.

Defense counsel called two custodians of Williams' hospital records. Both witnesses testified that the records prepared by the attending physician and nurses do not refer to a robbery. However, William Flores, a deputy sheriff, testified during cross-examination by the prosecutor that three to four days after the shooting, Williams filed a report that his pistol, handcuffs and handcuff case, .22 rifle, holster, 18 rounds of ammunition, puma knife, cartridge loop, and belt had been taken from him by the appellant and George.

Appellant's wife testified that on September 28th Williams drove up to the back of the garage and asked her about appellant and George. She told Williams that she had not seen them and denied his request to search the garage. According to Mrs. Hosey, Williams then threatened to shoot her, so she ordered him off the property. Mrs. Hosey testified that a few minutes after Williams had left, she heard a "noise" and went to investigate. She saw Williams run across the highway and "jump into a boat," but she testified that she never saw appellant or George. Appellant's daughters also testified that they had not seen their father or brother, and that they heard Williams threaten their mother.

The appellant, over the objection of his counsel, testified on his own behalf. According to appellant, he and George were hiding in his shop when Williams drove up. Appellant testified that he heard the officer threaten his wife; therefore, he pushed the shop doors open and ran across the highway. He told the jury that Williams pursued him and that when Williams' vehicle came to a stop, he went up to the driver's side of the vehicle and asked Williams "why he was messing with me." Appellant claimed that he then walked toward the back of Williams' vehicle, when George yelled "Daddy he's fixing to shoot you in the back." According to appellant, he then jumped around to the back of the vehicle and saw Williams aim a black .38 pistol at George. Appellant testified he ran and grabbed the gun, which subsequently discharged, missing George. Appellant claimed that he took the gun away from Williams, unloaded it, and threw it on the ground. Appellant denied shooting Williams and offered no explanation of how Williams was shot. Likewise, appellant denied taking any property from Williams' vehicle.

Jerry Mead, a State Trooper, was called by the defense to testify. Mead arrived at the scene a few minutes after the shooting. When questioned by the prosecutor, he testified that he found blood "splattered" on the inside of Williams' vehicle and on the grass. During the search of Williams' vehicle, Mead did not find Williams' .357 pistol, holster, .22 rifle, handcuffs, knife, or car keys. Mead testified that he did not find a black .38 pistol or its cartridges near the vehicle; however, he did find a long silver wrench near the left rear of the vehicle.

After reviewing all of the evidence in the case now before us, we determine that a rational trier of fact could have found the essential elements of aggravated robbery beyond a reasonable doubt. The jury is the exclusive judge of the facts, of the credibility of the witnesses, and of the weight to be given to their testimony. *Bonham v. State*, 680 S.W.2d 815, 819 (Tex.Crim.App. 1984), *cert. denied*, 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d 153 (1985).

The State introduced direct evidence showing the appellant intentionally and knowingly caused serious bodily injury to Williams by shooting him with a handgun. The evidence relating to the elements that he acted in the course of committing a theft and with the intent to obtain the property, however, is purely circumstantial.

Although there is no evidence that appellant demanded money or property from Williams, the evidence did establish that immediately after Williams was shot and

had fled from the scene, appellant and George were seen carrying the property to appellant's garage. Likewise, a few minutes after the shooting, the investigating officer did not find any of Williams' property in his vehicle.

■■ The intent to steal can be inferred from the defendant's words, actions, and conduct. *See Lincecum v. State,* 736 S.W. 2d 673, 680 (Tex.Crim.App.1987); *Banks v. State,* 471 S.W.2d 811, 812 (Tex.Crim.App. 1971); *Stout v. State,* 467 S.W.2d 409, 410 (Tex.Crim.App.1971); *Ludwig v. State,* 636 S.W.2d 869, 873 (Tex.App.—Waco 1982, pet. ref'd). A verbal demand is not the talisman of an intent to steal. *Fierro v. State,* 706 S.W.2d 310, 313 (Tex.Crim.App. 1986). Likewise, the fact that the theft occurred after the victim had been shot and fled from the scene does not call for a different result, since the shooting clearly faciliated the subsequent taking of property. *Fierro,* 706 S.W.2d at 313; *Banks,* 471 S.W.2d at 812.

The jury was free to believe Williams' testimony rather than appellant's. Since appellant denied all allegations against him and did not offer any reasonable explanation of how or why Williams was shot, a jury could conclude that appellant shot Williams with the intent to subsequently take his property. We overrule appellant's fourth point of error.

By points six, seven, and nine, appellant alleges the prosecutor committed reversible error when he attacked defense counsel during jury argument at the close of the guilt/innocence phase of the trial.

■■ In order to constitute a reversible error, a jury argument must be extreme or manifestly improper, violate a mandatory statute, or inject new and harmful facts into evidence. *Good v. State,* 723 S.W.2d 734, 736 (Tex.Crim.App.1986); *Brandley v. State,* 691 S.W.2d 699, 713 (Tex.Crim.App. 1985). The record reflects that the prosecutor made the following statements:

1. To me its a shame and disgrace to see some of the means and ways they have tried to imply to you things that happened, that unquestionably didn't happen; and

2. After that, ya'll heard alot of smoke and alot of rabbit trails.

These statements do not constitute reversible error. *See Love v. State,* 533 S.W.2d 6, 11 (Tex.Crim.App.1976).

■■ The appellant also complains that reversible error was committed when the prosecutor argued that "I am sure that defense attorneys, they'll get up after me and they'll disagree totally with the State's case. That's their job and that's what they are paid for." The prosecutor's remark represents permissible adversarial comment. *See Shipp v. State,* 482 S.W.2d 870, 871 (Tex.Crim.App.1972). We overrule points six, seven, and nine.

By points five and eight, appellant alleges the prosecutor committed reversible error when he went "outside the record" during jury argument at the punishment phase of trial.

The record reflects that during the punishment phase of the trial, the State called eighteen character witnesses who all testified that appellant's reputation in the community as a peaceable and law-abiding citizen was bad. The appellant again testified on his own behalf. His testimony consisted of accusing the State's character witnesses of being a part of a racist conspiracy against him. The defense did not call any character witnesses to testify on appellant's behalf.

■■ Initially, appellant complains of the prosecutor's statement that "Maybe I didn't hear [appellant], but I didn't hear one thing about saying he was sorry one bit for what happened to [Williams]...." Appellant objected on the grounds that arguing lack of remorse was not permissible.

Appellant's demeanor during his own testimony was properly in evidence by the mere fact that it was a part of his testimony; therefore, appellant's testimonial demeanor could be alluded to by the State in final argument on punishment. *See Good,* 723 S.W.2d at 737.

■■ Next, appellant urges this court to reverse this cause for the prosecutor's statement, "What I have seen of the evi-

dence and his display and discord that he has shown you and from the evidence we've seen, [appellant's] a disgrace to the Black race. I have a lot of respect for the Black race." At trial defense counsel objected to the statement as an improper personal attack on appellant. The trial court overruled the objection. On appeal appellant argues this statement was "outside the record." Since the point of error presented on appeal must be the same as the objection raised at trial, nothing is presented for review. *Burdine v. State*, 719 S.W.2d 309, 319 (Tex.Crim.App.1986). Even if appellant had not waived error, the prosecutor's comment was a proper response to appellant's attempt to portray himself as a victim of a racist conspiracy. We overrule points five and eight.

■ Appellant argues, in his tenth point of error, that the trial court committed "fundamental error" by charging the jury on parole and good conduct time credit in violation of the separation of powers doctrine and the due course of law provisions of the Texas Constitution.

The Court of Criminal Appeals recently held that Article 37.07, § 4(a) and any instruction given pursuant to that statute is unconstitutional. *Rose v. State*, 752 S.W. 2d 529, 535 (Tex.Crim.App.1988). The Court held that it is error to give the instruction, but the error is not automatically reversible. Pursuant to Tex.R.App.P. 81(b)(2), the judgment must be reversed unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment. *Id.* at 537. We find the following factors are important to our disposition of this issue.

First, appellant, during the guilt/innocence phase, volunteered that he had been found guilty of the attempted capital murder of Velton Williams.

Second, appellant, during the punishment hearing, called no character witnesses to testify on his behalf.

Third, appellant was questioned by the prosecutor about prior *arrests* for burglary, affray, criminal mischief, and theft.

Fourth, the jury was instructed that appellant could be placed on probation because the trial court found the appellant had no previous felony conviction since the attempted capital murder cause was still on appeal and not a final judgment.

Fifth, the trial court instructed the jury that they were not to consider the extent or the manner to which good conduct time or the parole law may be awarded to appellant. However, the prosecutor urged the jury to consider the effect of good time in its closing remarks during punishment hearing. The prosecutor argued that a long sentence should be imposed since the appellant had "certain rights" for "good time" and good behavior and that he was going to get out sooner or later.

Sixth, appellant received the maximum sentence of 99 years' imprisonment.

Despite the aggravated nature of the offense and the admission of four prior arrests for non-violent crimes, and in light of the facts that the prosecutor urged the jury to apply the good time and parole laws to the appellant and the jury imposed the maximum sentence, we cannot conclude beyond a reasonable doubt that the parole instruction made no contribution to the jury's assessment of the maximum allowable sentence. We sustain appellant's tenth point of error. Tex.R.App.P. 81(b)(2). *Cf. Zimmerman v. State*, 754 S.W.2d 402 (Tex.App.—Corpus Christi 1988, pet. ref'd); *Rodriguez v. State*, 745 S.W.2d 572 (Tex. App.—Corpus Christi 1988, pet. ref'd); *Hinojosa v. State*, 744 S.W.2d 319 (Tex.App. —Corpus Christi 1988, pet. ref'd); *Barreda v. State*, 739 S.W.2d 368 (Tex.App.—Corpus Christi 1987, pet. granted).

Because of the error in the punishment phase, the judgment of the trial court is set aside, and the cause remanded to the trial court for further proceedings in accordance with *Ex Parte Klasing*, 738 S.W.2d 648, 650 (Tex.Crim.App.1987).