IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-93-076-CR





PETER ACTIE,



 APPELLANT


vs.





THE STATE OF TEXAS,



 APPELLEE





 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT



NO. 0922860, HONORABLE TOM BLACKWELL, JUDGE PRESIDING



 





 A jury convicted appellant of attempted murder. Tex. Penal Code Ann.
§ 15.01 (West Supp. 1994) & § 19.02(a)(1) (West 1989). The jury assessed punishment,
enhanced by two prior felony convictions, at confinement for seventy-five years. Tex. Penal Code
Ann. § 12.42(d) (West 1989). We will affirm the judgment.

 Appellant presents four points of error, the most serious being that the trial court
erred in refusing to submit a jury instruction on the lesser included offense of attempted voluntary
manslaughter. When timely requested, a jury instruction on a lesser included offense should be
given if the offense for which the requested instruction is made is a lesser included offense of the
offense charged and there is evidence from which the jury could reasonably conclude that, if
guilty, the accused is guilty of only the lesser included offense. Ramos v. State, 865 S.W.2d 463
(Tex. Crim. App. 1993); Lincecum v. State, 736 S.W.2d 673 (Tex. Crim. App. 1987); Royster
v. State, 622 S.W.2d 442 (Tex. Crim. App. 1981).

 Appellant timely and properly requested the trial court to give a jury instruction
on attempted voluntary manslaughter. The Court of Criminal Appeals has held that, "in
appropriate facts and circumstances attempted voluntary manslaughter constitutes a penal offense
when it becomes a lesser included offense to attempted murder." Ex parte Bugg, 644 S.W.2d
748, 759 (Tex. Crim. App. 1983); see also Nobles v. State, 843 S.W.2d 503 (Tex. Crim. App.
1992). In the circumstances of this case, attempted voluntary manslaughter could be a lesser
included offense. Therefore, we must determine if the facts and circumstances of this case
support a finding that appellant, if guilty, is guilty of only the offense of attempted voluntary
manslaughter and whether the trial court should have given the requested instruction to the jury.

 The Texas Penal Code defines the offense of voluntary manslaughter as follows:



Voluntary Manslaughter



(a) A person commits an offense if he causes the death of an individual under
circumstances that would constitute murder under Section 19.02 of this code,
except that he caused the death under the immediate influence of sudden
passion arising from an adequate cause.


(b) "Sudden passion" means passion directly caused by and arising out of
provocation by the individual killed or another acting with the person killed
which passion arises at the time of the offense and is not solely the result of
former provocation.


(c) "Adequate cause" means cause that would commonly produce a degree of
anger, rage, resentment, or terror in a person of ordinary temper, sufficient
to render the mind incapable of cool reflection.



 Texas Penal Code Ann. § 19.04 (West 1989). Criminal attempt is defined as
follows:



Criminal Attempt



(a) A person commits an offense if, with specific intent to commit an offense,
he does an act amounting to more than mere preparation that tends but fails
to effect the commission of the offense intended.


 Tex. Penal Code Ann. § 15.01(a) (West Supp. 1994).


 On New Year's Day 1992, appellant and Vachael Starks drove from Houston to
Austin. For several months before that day, they had a stormy, romantic relationship during
which they traveled throughout the United States and in the Caribbean. While they were in Las
Vegas, they were married, each of them using an assumed name. Starks testified that appellant
"kidnapped" her at gun point in Houston and on the way to Austin he stopped twice and pistol
whipped her. She exhibited, to the jury, the scars she attributed to those beatings. Starks testified
that when they reached Austin they went to appellant's brother's apartment. While they were
there, they argued and fussed. She said appellant "bragged" to his brother that he was going to
kill Starks. When they were leaving the apartment, appellant held his brother's baby and told
Starks to tell the baby good-bye for the last time. Appellant had a motive for killing Starks,
because she witnessed a murder in Houston for which appellant had been charged, but not yet
tried.

 Starks testified that after they left the apartment, they checked in at Motel 71. 
Appellant placed furniture in front of the door, blocking it. Appellant ordered Starks to disrobe,
but before she had completely done so, without her consent and against her will, appellant
sodomized and raped her. She testified that thereafter she thought he would kill her so she jumped
through a glass window and ran toward the motel office. Appellant came after her and brought
her back to the room. While appellant was getting his gun, she ran into the parking lot toward
a Dairy Queen which was near the highway. Appellant ran after her and shot at her twice. One
of the bullets penetrated her arm, went into her body, and injured several organs, including her
liver, stomach, and lungs. Starks was taken to the hospital and appellant escaped in his car. A
physician testified Starks sustained a "lethal injury" and that during the first few hours she
received fourteen units of blood, enough to replace all of her blood. Before the first procedure
was performed, the physician thought Starks would die.

 Appellant's version of the facts is different from those related by Starks. Appellant
denied "kidnapping" Starks and denied beating her on the way to Austin. He testified that when
they reached Austin they checked in at Motel 71. They made up, "loved each other," had sex,
showered together, dressed, and went to appellant's brother's apartment. While at the apartment,
they argued and fussed about a gift of perfume Starks had received from her former boyfriend. 
Appellant said he and Starks then returned to the motel. On direct examination appellant testified:



Q. So now we are, I believe, back at the hotel on the evening of January the 1st,
correct? You've left your brother's and you are back at the hotel?


A. Right.


* * * * *



Q. Was there an argument?


A. Yes, there was an argument.


* * * * *



Q. When you got back to the motel room, was there any particular thing that just
culminated this argument?


A. Yes. When we got back to the motel, the topic came along that she had sex
with Carl [Starks' former boyfriend]. And that's when we started fighting.


Q. You mean physically fighting?


A. Physically fighting.


Q. Okay. Could you explain to the jury how -- I mean, what happened during
this physical fight? I mean, were you all punching each other or what were
you doing?


A. As I remember, as soon as we got in, I guess after she told me this, I must
have hit her first, and -- during the scuffle, I mean, argument, fight. I never
hit her with my fist; I hit her with my open hand. And at the time it started
was in the middle of the room and it got all the way to the front, at which
point I pushed her and she fell through the window.


* * * * *



Q. I mean, were you intending to push her through a window when you pushed
her?


A. No.


Q. And what happened as she went through the window?


A. When she fell through the window, I noticed that her foot was sticking up, or
either looked hung, as she said. And I grabbed her foot to get her loose. And
she was telling me to let her foot go.


Q. Okay. At this point, where was the gun?


A. Still in the room.


Q. Still between the mattresses?


A. Yes.


Q. So after you got her foot loose, what did she do?


A. She ran to the office, office door.


Q. And what did you do?


A. I ran after her and by the time she got in there, I had met up with her. And
by the time the office -- there was an office guy in there. And when I grabbed
her and was taking her back to the room, I told him that everything was all
right, we were just having an argument.


* * * * *



Q. And what happened next? Did you fight with her anymore?


A. When we went inside, I told her that we was leaving, basically, and that we
was going to get my stuff because she basically didn't have anything.


Q. What was your frame of mind at that point?


A. To leave and go --


Q. I mean as far as your --


A. My state of mind?


Q. Yeah.


A. I was angry. I was still angry. I was still out of control, enraged.


Q. And what happened next?


A. What happened next was, as -- when we got in -- got in the place, the door
was still open. I went to the back to get my -- retrieve my little -- what little
parts of articles that I had. And on my way to the back, I noticed that, you
know, Vay was reaching or going towards where the gun was. And when I
turned around and came back, you know, she had a hold of the gun and we
scuffled over the gun. And I got the gun out, away from her. And at that
point, she ran back out the door.


Q. And what did you do?


A. I ran after her with the gun in my hand.


* * * * *



Q. So you're running behind her with a gun in your hand. What happened?


A. As I was running, it wasn't a long distance. I was running with the gun like
this. I don't know for sure whether or not the gun went off or either I pulled
the trigger and shot her. But when the -- the gun went off twice. She fell. 
And at the time -- 


Q. Okay. Now, let's stop at this point. Have you thought a lot about that very
few seconds right there as to -- from the time you took the gun and chased
after her until the time that she was shot, have you tried to remember exactly
what went through your head at that point?


A. At that time, I can't really say that I was thinking about anything. The only
thing I was thinking about, I guess, was running after her and getting her
back.


Q. Okay. I mean, had you had an opportunity, really, to calm down from the
previous arguments at that point?


A. No. The only time that we had, like I said, was when we were on the way --
on the ride down to Austin. And then things escalated again when we went
from Baron's place.


Q. Did you think about intentionally shooting her?


A. No. I wasn't -- it was never in my mind.


* * * * *



Q Q. Did you shoot her?


A. All I can say is that the gun went off and that I may have pointed the gun at
her and she got shot.


Q. Well, might you have also pulled the trigger?


A. Yes.


Q. Did you intend, at that point, to kill her?


A. I never intended on killing Vay. The whole time me and Vay was together,
you know, I was mostly protecting things. I never tried to kill her.



 On cross-examination appellant testified:



Q. This crime of passion that you have cooked up, didn't you tell Vay about that
before you even did it?


A. There was no crime of passion.


Q. No crime of passion?


A. It just happened.


Q. You never told Vay that you could kill her with impunity because you could
claim it was a crime of passion?


A. I never said that.


* * * * *



Q. So that's true, when you killed -- when you shot Vay, it was not a crime of
passion?


A. I had no intention of shooting Vay.


Q. And you didn't do it because of the heat of the moment, did you?


A. No.


Q. So what you are saying now is that this was just an accident?


A. What I'm saying is, like I said earlier, I mean, under the situation I was angry,
there was a lot of stress, there was fighting. I was running after Vay to get
her back. And like I said, the gun went off.


Q. The gun went off because you dropped it?


A. No.


Q. How was it that the gun went off?


A. I pulled the trigger, I guess.


Q. You guess. You don't remember whether you pulled the trigger or not?


A. I'm not for sure whether I pointed the gun or it went off.


* * * * *



Q. Wasn't it only after you had been told that Vay died that you went down and
turned yourself into the police?


A. No, that's not true.


Q. And you expect this jury to believe that on the night of January 2nd or the
early morning of January 2nd, you accidentally killed Vay?


A. Accidentally killed Vay?


Q. Accidentally shot Vay.


A. That's what happened.


Q. And you had no intent to ever kill her?


A. No.



 The testimony of an accused alone can be sufficient to raise the issue of voluntary
manslaughter. Brunson v. State, 764 S.W.2d 888, 893 (Tex. App.--Austin 1989, pet. ref'd);
Payne v. State, 668 S.W.2d 495, 497 (Tex. App.--Austin 1984, no pet.). However, the Court of
Criminal Appeals recently said: "In Godsey [v. State, 719 S.W.2d 578 (Tex. Crim App. 1986)],
we held that a statement made by a defendant `cannot be plucked out of the record and examined
in a vacuum' in a lesser included offense analysis." Ramos v. State, 865 S.W.2d 463, 465 (Tex.
Crim. App. 1993). And "where the State has introduced sufficient evidence to support a charge
on the primary offense, we look at all the evidence introduced to decide if a lesser included
offense is raised. BUT, in looking at all the evidence to see if the `guilty only' test is met, we
must look at it in the context of facts." Godsey, 719 S.W.2d at 585 (Miller, J., concurring).



A charge on voluntary manslaughter should be given only when there is evidence
that the defendant acted under the immediate influence of sudden passion arising
from adequate case. Marras v. State, 741 S.W.2d 395, 405 (Tex. Crim. App.
1987). "Sudden passion" is defined by statute as "passion directly caused by and
arising out of provocation by the individual killed or another acting with the person
killed which passion arises at the time of the offense and is not solely the result of
former provocation." Tex. Pen. Code Ann. § 19.04(b) (1974). "Adequate cause"
is defined as "cause that would commonly produce a degree of anger, rage,
resentment, or terror in a person of ordinary temper, sufficient to render the mind
incapable of cool reflection." Tex. Pen. Code Ann. § 19.04(c) (1974).



Brunson, 764 S.W.2d at 893; see also Lincecum, 736 S.W.2d at 679; Owens v. State, 786 S.W.2d
805, 807-08 (Tex. App.--Fort Worth 1990, pet. ref'd).

 In Aquino v. State, 710 S.W.2d 747 (Tex. App.--Houston [14th Dist.] 1986, pet.
ref'd), in similar circumstances, where the defendant claimed the trial court erred in refusing to
instruct the jury on voluntary manslaughter as a lesser included offense of murder, it was said:



Appellant testified that the deceased was astride him with a knife when he awoke
and that she stabbed him. In the struggle to get up, appellant grabbed the
deceased's hands and she stabbed herself in the neck. Asked if he intended to kill
Ms. Davis or cause her serious bodily injury, appellant replied "I had no intentions
of doing her any harm." Appellant's testimony denied the existence of an essential
element of both murder and voluntary manslaughter, the intent to kill. We find
that appellant is not entitled to a charge on the lesser included offense of voluntary
manslaughter because he failed to meet the second prong of Royster, that if he is
guilty, he is guilty of only voluntary manslaughter.



 Aquino, 710 S.W.2d at 751. Appellant testified that the shooting of Starks was an
accident. He testified repeatedly he did not intend to shoot Starks or to kill her. He testified that
when he was running after her and shot Starks, "I can't really say that I was thinking about
anything. The only thing I was thinking about, I guess, was running after her and getting her
back . . . . I never intended on killing Vay. . . . I had no intention of shooting Vay." Appellant
denied shooting Starks in the heat of passion. Although there is testimony concerning Starks
having sex with a former boyfriend who grew up in her neighborhood, the record fails to show
when this may have occurred. Appellant testified that Starks had not to his knowledge had a
relationship with her former boyfriend since Starks and appellant had been married. When all of
the evidence is considered in context, it fails to raise the issue of attempted voluntary
manslaughter. It is not sufficient to show that appellant acted under the immediate influence of
sudden passion arising from an adequate cause. Since the evidence is insufficient to support a
finding that appellant was guilty of only the lesser included offense of attempted voluntary
manslaughter, the trial court did not err in refusing to instruct the jury on the lesser included
offense. Appellant's first point of error is overruled.

 Appellant's second point of error is that the trial court erred in overruling his pro
se motion to strike the enhancement allegation. This point is merely stated and not briefed; it has
no merit and is overruled. Tex. R. App. P. 74(f); State v. Gonzalez, 855 S.W.2d 692, 697 (Tex.
Crim. App. 1993).

 In points of error three and four, appellant asserts that Tex. Code Crim. Proc. Ann.
art. 37.07 (West 1981 & Supp. 1994) violates both federal and state constitutional provisions and
is harmful as applied to him. There were no trial objections raising these points of error;
therefore, they were not preserved for review.

 The appellant argues that the trial court's instructions, which conform to the
requirements of article 37.07, invited the jury to speculate about the early release of dangerous
criminals. Furthermore, appellant argues: "Instructing the jury on parole, giving inaccurate
information to the jury on good conduct time, and denying by structure the right to clarify and
explain good time and parole raised the issue of fundamental fairness." If these points of error
were preserved for review in the trial court, they are without merit. The same arguments
appellant makes here were rejected by the Court of Criminal Appeals in Oakley v. State, 830
S.W.2d 107 (Tex. Crim. App. 1992) and Bruno v. State, 845 S.W.2d 910 (Tex. Crim. App.
1993). Points of error three and four are overruled.

 The judgment of the trial court is affirmed.



 

 Carl E. F. Dally, Justice 

Before Justices Kidd, B. A. Smith and Dally*

Affirmed

Filed: April 27, 1994

Do Not Publish












* Before Carl E. F. Dally, Judge (retired), Court of Criminal Appeals, sitting by assignment. 
See Tex. Gov't Code Ann. § 74.003(b) (West 1988).