IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 90-2142
_____


KAVIN WAYNE LINCECUM,

                              Petitioner-Appellant,

v.

JAMES A. COLLINS, Director,
Texas Department of Criminal Justice,
Institutional Division

                              Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____
(April 7, 1992)


Before KING, JOLLY, and JONES, Circuit Judges.

KING, Circuit Judge:

     Kavin Wayne Lincecum, a Texas prisoner under a sentence of

death, appeals the dismissal of his petition for a writ of habeas

corpus.  Although Lincecum raised 18 claims in the district

court, his appeal involves only three issues: (1) whether the

state trial court erred in refusing to give his requested

instruction on the lesser included offenses of murder and

voluntary manslaughter; (2) whether the district court erred in

denying his motion for an evidentiary hearing on the claims that

(a) his trial counsel rendered constitutionally ineffective

assistance and (b) the Texas death penalty statute is

unconstitutional because no rational jury can answer the second special issue relating to future dangerousness; and (3) whether the Texas capital sentencing statute was unconstitutionally applied because the jury had no vehicle through which to consider his mitigating evidence of a troubled childhood and emotional difficulties around the time of the crime. Having carefully considered all three issues, we affirm the denial of habeas relief.

## I. FACTS AND PROCEDURAL HISTORY

Lincecum was convicted of capital murder in a Texas court for killing Kathy Ann Coppedge during the course of a kidnapping, robbery and attempted sexual assault. The jury answered the three special issues in the affirmative and sentenced Lincecum to death. The facts are fully presented in the opinion of the Texas Court of Criminal Appeals affirming Lincecum's conviction on direct appeal, Lincecum v. State, 736 S.W.2d 673 (Tex. Crim. App. 1987), cert. denied, 486 U.S. 1061 (1988). The facts we recite here are largely taken from the only account of the crime, Lincecum's confession,[1] and are presented only to the extent necessary for an understanding of the issues presented in this appeal.

On August 11, 1985, Lincecum encountered Kathy Ann Coppedge and her son, Casey, at a parking lot across the street from a

---

[1] The confession was introduced at trial. Lincecum did not testify in his own behalf.

2

church in Brenham.  As Kathy and Casey entered Kathy's car, Lincecum forced his way in and drove off toward the town of Burton.  After driving a few miles, he turned off on a gravel road and stopped.  He went through Kathy's purse and took her money.  He then told Casey to get in the back seat, and, when Casey asked him not to hurt his mother, Lincecum replied that he would not.

Lincecum ordered Kathy out of the car and told her to take off her clothes.  They got back in the car, and Kathy picked up Lincecum's knife and stabbed him in the left side.  Lincecum retrieved the knife, folded it up, and proceeded to choke her.[2] He then bound Casey's hands with the strap from Kathy's purse and placed Casey in the trunk.  He eventually bound Kathy's hands and placed her in the trunk as well.  He drove the car to another location and abandoned it, taking Kathy's rings and watch.  The evidence showed that the temperature that day exceeded 100 degrees.  Kathy and Casey Coppedge were found dead in the trunk of the car later that night.

The evidence showed that Kathy most likely died as a result of strangulation rather than being placed in the trunk, while Casey probably was still alive when placed in the trunk.  Aurelio Espinola, the chief deputy medical examiner for Harris County who

---

[2] Lincecum stated in his confession that he choked her with her panty hose, but Aurelio Espinola, the chief deputy medical examiner for Harris County who testified regarding the post mortem examination conducted on Kathy Coppedge, disputed that panty hose was the ligature used to strangle her.  He contended that it was more likely that Lincecum used the strap from her purse or a length of twine found underneath the bodies.

3

testified concerning the post mortem examination, testified that the ligature marks around Kathy's neck indicated that she probably was strangled for a long period of time. He estimated that she would have lost consciousness after about three minutes, but that the ligature probably was held around her neck for approximately three more minutes.

Two persons testified at trial that they saw a black man drive off from the parking lot in a blue car with a woman, and both testified that they heard cries for help. There also was testimony from a state forensic serologist that Kathy Coppedge's dress had male semen stains all over the inside of the skirt part of the dress. Testing disclosed that a person having Lincecum's blood type could have deposited the semen on the dress. When Kathy was found, her dress and bra were ripped, and her panties were found beneath her legs.

Lincecum did not offer any evidence at the punishment phase of the trial. During the guilt phase, however, his aunt, Eula Belle Moore, testified that in June of 1985 she discussed Lincecum's state of mind with Lincecum's parole officer, Mary Kathryn Hebert. Moore had been concerned that Lincecum was not talking much, and asked Hebert whether she could encourage Lincecum to see a psychiatrist. She told Hebert that she thought Lincecum "was disturbed . . . he was down under and I could see he was very quiet. I felt he needed to talk to somebody." Later, Moore testified that she thought Lincecum "felt that his momma didn't care for him." Hebert confirmed the discussions

4

with Moore about Lincecum's welfare. Reading from her notes, she stated that Moore had told her that Lincecum did not want to talk and that Lincecum's problems may have stemmed from feeling unloved by his mother.

Lincecum's conviction and sentence were affirmed on appeal. Lincecum v. State, 736 S.W.2d 673 (Tex. Crim. App. 1987), cert. denied, 486 U.S. 1061 (1988). Lincecum then sought state post-conviction relief in the 23rd Judicial District of Brazoria County, Texas, raising many of the same claims he later raised in his federal petition. The state court entered findings of fact and conclusions of law and denied the petition on December 9, 1988. The Texas Court of Criminal Appeals affirmed. On January 12, 1989, six days before his scheduled execution, Lincecum filed the instant petition for habeas corpus relief in the district court.[3] The district court granted a stay of execution. On December 6, 1989, the district court denied relief on all claims and vacated the stay of execution. After Lincecum's request for a certificate of probable cause was granted, we reinstated the stay of execution pending final disposition of the appeal. After the original briefing was completed, we requested supplemental briefing on the applicability, if any, of our recent decision in Graham v. Collins, 950 F.2d 1009 (5th Cir. 1992) (en banc) (addressing mitigating evidence and the Texas capital sentencing statute), on the case. We are now prepared to render a decision.

_____

[3] The record of the state habeas proceedings shows, and the State agrees, that Lincecum exhausted the claims presented in his federal petition in state court.

5

II. DISCUSSION

A. Failure to Instruct on Lesser Included Offenses

At trial, Lincecum requested instructions on the lesser included offenses of murder and voluntary manslaughter. The trial judge refused, instructing the jury only on the offense of capital murder. Lincecum argues that the failure to instruct on the lesser included offenses violated his rights under the Eighth and Fourteenth Amendments.

In Beck v. Alabama, 447 U.S. 625 (1980), the Supreme Court invalidated that aspect of the Alabama capital murder statute which prohibited the trial judge from giving an instruction on a lesser included offense of capital murder. The Court's central concern was that the unavailability of a lesser included offense instruction would increase the risk of an unreliable adjudication of guilt, a risk that cannot be tolerated in a capital case. Id. at 637-38. The Court indicated that the basic rule extant in the states on when a defendant is entitled to a lesser included offense instruction would comport with federal due process requirements. This standard was expressed as "a defendant is entitled to a lesser included offense instruction where the evidence warrants it." Id. at 636 & n.12 (citing, inter alia, Day v. State, 532 S.W.2d 302 (Tex. Crim. App. 1975)); see Hopper v. Evans, 456 U.S. 605, 610 (1982) (Beck stands for the proposition that juries in capital cases must have the opportunity to consider a lesser included noncapital offense whenever the evidence would have supported such a verdict). This

6

standard continues to apply in Texas. See Godsey v. State, 719 S.W.2d 578, 584 (Tex. Crim. App. 1986) (instruction must be given if there is "some evidence in the record that if the defendant is guilty, he is guilty of only the lesser offense"); Lincecum, 736 S.W.2d at 678. Although Beck itself spoke only to a statute under which the judge could not give the requested instruction, we have held that its rationale applies equally to cases in which a trial judge refuses to give an instruction which is available under state law. Cordova v. Lynaugh, 838 F.2d 764, 767 & n.2 (5th Cir.), cert. denied, 486 U.S. 1061 (1988); Reddix v. Thigpen, 805 F.2d 506, 511-12 (5th Cir. 1986).

In federal trials, "a lesser included offense instruction should be given 'if the evidence would permit a jury rationally to find [a defendant] guilty of the lesser offense and acquit him of the greater.'" Hopper, 456 U.S. at 612 (citing Keeble v. United States, 412 U.S. 205, 208 (1973)). We recognized in Cordova that the standard described in Beck and the federal standard are equivalent. 838 F.2d at 767. Thus, the question is whether a rational jury could have convicted Lincecum on the lesser included offense of murder or voluntary manslaughter yet acquitted him on the offense of capital murder.

### 1. **Murder**

Lincecum was convicted for the offense described in section (a)(2) of the Texas capital murder statute. The statute, Tex. Penal Code Ann. § 19.03, provides in relevant part:

§ 19.03 Capital Murder

7

(a) a person commits an offense if he commits murder as defined under Section 19.02(a)(1) of this code and:

. . .

(2) the person intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, or arson . . . .

The murder statute in Texas, Tex. Penal Code Ann. § 19.02, provides in relevant part:

§ 19.02 Murder

(a) A person commits an offense if he:

(1) intentionally or knowingly causes the death of an individual;

(2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or

(3) commits or attempts to commit a felony, other than voluntary or involuntary manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

The district court, in rejecting the claim that a murder instruction should have been given, held that a jury could not rationally have convicted Lincecum of murder because the only evidence that Lincecum was at the scene placed him there in the course of the commission of a robbery, kidnapping or aggravated sexual assault. Lincecum argues that this analysis is erroneous in that it assumes that under Texas law the jury could not have found him guilty of a murder committed in the course of one of the three underlying offenses yet acquitted him of capital murder. A jury rationally <u>could</u> come to this conclusion, he

8

points out, because capital murder under § 19.03(a)(2), in addition to requiring proof that the murder was caused while in the course of committing one of the underlying offenses, requires proof that the defendant acted knowingly and intentionally in causing the victim's death. Because the crimes described in §§ 19.02(a)(2) and (3) do not require an intent to kill, he could have been convicted of one of the lesser included offenses even if the same evidence which placed him at the scene of the murder (chiefly, his own confession) showed that he had committed a robbery, kidnapping or aggravated sexual assault.

Lincecum is correct that the intent element of capital murder makes it possible for him to have been acquitted of that crime yet convicted of murder. Not every death which is caused in connection with a robbery, kidnapping or aggravated sexual assault leads to a conviction for capital murder; a person can be convicted of the lesser included offense of murder if he caused the death in connection with one of these offenses with intent only to cause serious bodily injury (§ 19.02(a)(2)) or if his only intent was to commit the underlying offense. (§ 19.02(a)(3)).[4] The question whether an instruction on murder was warranted therefore depends on whether a rational jury could have found that Lincecum did not intend to kill Kathy Coppedge.

---

[4] For example, felony murder under § 19.02(a)(3) requires only the intent to commit the underlying offense. Livingston v. State, 739 S.W.2d 311, 336 (Tex. Crim. App. 1987), cert. denied, 487 U.S. 1210 (1988). Evidence that placed Lincecum at the scene of the murder while committing a robbery therefore did not necessitate a capital murder conviction.

9

On the evidence in this case, we hold that such a jury finding would have exceeded the bounds of rationality, for the evidence of Lincecum's intent to kill was simply overwhelming. Lincecum attempts to demonstrate otherwise by pointing to that part of his confession in which he allegedly told Casey Coppedge that he would not hurt Kathy Coppedge. This statement, viewed in light of Lincecum's actions shortly after making it, does not evince a lack of intent to kill Kathy Coppedge, but rather an intent to mollify or reassure Casey. It is entirely inconsistent with the brutal treatment of Kathy that followed. By Lincecum's own admission, the statement was made before he ordered Kathy Coppedge out of the car, before she stabbed him with his knife, before he choked her and before he locked her in the trunk. Given the evidence that Lincecum continued choking Kathy for approximately three minutes after she was dead, no rational juror could have taken his statement to Casey as demonstrating a lack of an intent to kill. Quite the contrary, the significant amount of time he choked Kathy is strong evidence of his intent to kill. Cf. Fearance v. State, 620 S.W.2d 577, 584 (Tex. Crim. App. 1980) (evidence that defendant repeatedly stabbed victim shows intent to murder), cert. denied, 454 U.S. 899 (1981).

Even if the jury disbelieved the expert medical testimony that the choking continued after Kathy Coppedge was dead[5] -- and therefore proceeded on the assumption that she was still alive

_____

[5] A rational jury might have disbelieved this testimony, as it contradicted Lincecum's statement.

10

when placed in the trunk -- Lincecum's action in locking her in the trunk on a day in which the temperature exceeded 100 degrees clearly reveals an intent to kill.  Lincecum focuses exclusively on the statement he allegedly made to Casey, but the rest of his statement, as well as the physical evidence, can lead only to the conclusion that he intended to kill Kathy Coppedge.

### 2. <u>Voluntary Manslaughter</u>

Lincecum also was not entitled to an instruction on voluntary manslaughter.  The voluntary manslaughter statute in Texas, Tex. Penal Code Ann. § 19.04, provides in relevant part:

§ 19.04 Voluntary Manslaughter

> (a) A person commits an offense if he causes the death of an individual under circumstances that would constitute murder under Section 19.02 of this code, except that he caused the death under the immediate influence of sudden passion arising from an adequate cause.

Sudden passion is defined as "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." Tex. Penal Code Ann. § 19.04(b).  Adequate cause is defined as "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection."  Tex. Penal Code Ann. § 19.04(c).  Lincecum contends that the evidence from his confession that he strangled Kathy Coppedge only after she stabbed him with his knife could lead a rational jury to find that he acted with sudden passion arising from adequate cause.

11

The Texas Court of Criminal Appeals observed that Kathy Coppedge stabbed Lincecum in self defense and in the defense of her son. Under these circumstances, the court held, Lincecum, even if assumed to be acting under sudden passion, could not claim that he acted with adequate cause. Lincecum, 736 S.W.2d at 679. The court cited Penry v. State, 691 S.W.2d 636 (Tex. Crim. App. 1985), cert. denied, 474 U.S. 1073 (1986), and Goff v. State, 681 S.W.2d 619 (Tex. App. - Houston [14th Dist.] 1983), aff'd, 720 S.W.2d 94 (Tex. Crim. App. 1986), in support of its conclusion. In Penry, the court had held that the issue of voluntary manslaughter was not raised where the victim stabbed the defendant with a scissors while being raped, but where the defendant initiated the criminal episode, committed an aggravated rape before killing the victim, and revealed in his confession an intent to kill the victim. Penry, 691 S.W.2d at 641-42. In a footnote, the court noted that it would be difficult to imagine a situation in which sudden passion could arise from adequate cause while the defendant was in the course of committing one of the underlying offenses which would support a capital murder conviction under Tex. Penal Code Ann. § 19.03. 691 S.W.2d at 642 n.2. In Goff, the court of appeals had held that there was no adequate cause where the victim may have stabbed the defendant, but where the defendant's testimony evidenced an intent to hurt the victim. 681 S.W.2d at 625.

According to Lincecum's own confession, he retrieved the knife from Kathy Coppedge, folded it up, and then proceeded to

12

strangle her and place her in the trunk, all while committing one of the underlying offenses of § 19.03. Texas law plainly does not consider adequate cause to arise under these circumstances. Thus, because the jury was precluded as a matter of state law from finding that Lincecum committed voluntary manslaughter, the trial judge's failure to instruct the jury on this offense was not constitutional error.[6]

B. Refusal to Grant Evidentiary Hearing

Lincecum next argues that the district court erred in

---

[6] As in Hill v. Black, 920 F.2d 249 (5th Cir. 1990) (per curiam), opinion on rehearing, 932 F.2d 369 (5th Cir. 1991), our conclusion is driven by the unavailability, as a matter of state law, of an instruction on the lesser included offense under the facts presented to the jury. In Hill, the petitioner sought an instruction on a lesser included offense of capital murder. In our opinion on rehearing, we responded to the petitioner's argument that Cordova required an independent examination of the evidence by explaining that "[w]here, as here, a claim turns on an application of state law rather than federal law, this court must give deference to the articulation by the state's highest court of how the state law applies to the facts of the case." Hill, 932 F.2d at 374. The evidence in that case showed that the murder took place during the commission of a robbery, Hill, 932 F.2d at 374; Hill v. State, 432 So. 2d 427, 440 (Miss.), cert. denied, 464 U.S. 977 (1983), and Mississippi law precluded a conviction for anything less than capital murder if these two crimes "'are connected in a chain of events and occur as part of the res gestae.'" Hill v. State, 432 So. 2d at 441 (quoting Pickle v. State, 345 So. 2d 623, 627 (Miss. 1977)). The effect of state law on Lincecum's entitlement to an instruction is the same as in Hill: under the state law of voluntary manslaughter as articulated by the Texas courts, a defendant is not, as a matter of law, entitled to an instruction under the facts presented to Lincecum's jury. Thus, even taking as true all the evidence which might establish adequate cause, a jury is precluded as a matter of state law from finding that Lincecum satisfied the elements of voluntary manslaughter. Whether this analysis is expressed as invocation of the § 2254(d) presumption of correctness, as in Hill, or as a simple application of the state law governing the lesser included offense, the result is the same.

13

denying, without holding an evidentiary hearing, his claims that he received ineffective assistance of counsel and that the inability of a jury rationally to determine the future dangerousness of convicted murderers renders unconstitutional the Texas capital sentencing statute.

### 1. The Ineffective Assistance Claim

In the district court, Lincecum alleged thirteen separate ways in which his appointed trial counsel, Robert J. Kuhn, provided ineffective assistance.  The district court found that all the allegations were too conclusory to raise an ineffectiveness claim under Strickland v. Washington, 466 U.S. 668 (1984), and refused to grant an evidentiary hearing.  Among Lincecum's claims were that counsel "fail[ed] to introduce available mitigating evidence at the penalty phase of the trial in the form of testimony from the defendant's family members, acquaintances, clergy and former girlfriend and her children" and "fail[ed] to introduce any evidence whatsoever at the penalty phase of the trial."  On appeal, Lincecum contests the denial of his motion for an evidentiary hearing as to these claims of ineffectiveness only.

To succeed on an ineffectiveness claim, Lincecum must show (1) that counsel's performance was deficient in that it fell below an objective standard of reasonableness and (2) that the deficiency actually prejudiced the defense.  Strickland, 466 U.S. at 688-94; Smith v. Puckett, 907 F.2d 581, 584 (5th Cir. 1990), cert. denied, 111 S. Ct. 694 (1991).  As the range of attorney

14

conduct that may be considered reasonable is extremely wide and highly dependent on the necessities of a given case, <u>Strickland</u>, 466 U.S. at 688-89, our review on the first "prong" of the <u>Strickland</u> test is highly deferential. <u>Id.</u> The second "prong" requires a defendant to demonstrate a reasonable probability that, but for the attorney's unprofessional errors, the result of the proceeding would have been different. <u>Id.</u> at 694. A court reviewing an ineffectiveness claim need not approach these inquiries in any particular order; a failure to establish either requirement necessarily defeats the claim. <u>Id.</u> at 697; <u>Smith</u>, 907 F.2d at 584. With these standards in mind, we proceed to consider Lincecum's contention that a federal evidentiary hearing was necessary to evaluate this claim.

In the state collateral proceedings, Lincecum raised substantially the same allegations of ineffectiveness in Kuhn's failure to investigate and present mitigating evidence as he raised in the district court. He did not, however, offer any affidavits or other evidence which would indicate that other persons were in fact willing to testify on his behalf had they been contacted, nor did he reveal what the likely substance of the undiscovered mitigating evidence would have been. The court ordered Kuhn to respond to all of Lincecum's allegations of ineffective assistance. Kuhn did so in a detailed affidavit, explaining that he pursued all potential avenues of mitigating evidence but decided that only Lincecum's aunt and parole officer could be of assistance. He further stated that Lincecum's former

15

girlfriend, Rita Mathis, had turned out to be antagonistic toward Lincecum and that, despite attempts to locate additional character witnesses, he was aware of no one else who could have testified in Lincecum's behalf and of no other evidence that could have helped.  He also pointed out that he decided to abandon any defense based on a mental defect after the psychologist who interviewed Lincecum told Kuhn that she did not believe Lincecum suffered from any such defect.  Finding the assertions in Kuhn's affidavit to be true, the state court concluded that Lincecum had received the reasonably effective assistance of counsel demanded by the Constitution with respect to the presentation of mitigating evidence.[7]

A federal evidentiary hearing on a constitutional claim must be held only where the state court has not provided a hearing, where the petitioner alleges facts which, if proved, would entitle him to relief, and where the record reveals a genuine factual dispute.  Johnson v. Estelle, 704 F.2d 232, 239 (5th Cir. 1983), cert. denied, 465 U.S. 1009 (1984).  Where the state court has held a hearing to consider the claim, we must presume the correctness of its factual findings.  28 U.S.C. § 2254(d); Sumner v. Mata, 449 U.S. 531 (1981); King v. Collins, 945 F.2d 867, 868 (5th Cir. 1991).  The predicate facts which form the basis for a claim of ineffective assistance of counsel are subject to this presumption.  Strickland, 466 U.S. at 698; Carter v. Collins, 918

---

[7] The state court did not address the prejudice prong of Strickland.

16

F.2d 1198, 1202 (5th Cir. 1990).  Lincecum argues that the presumption does not apply here because the relevant finding states that "[t]here was no 'mitigating evidence' which defense counsel knew about, but failed to present to the jury during the penalty phase of the trial."  This, he says, means that the state court made a finding only with respect to evidence Kuhn already knew about, and made no finding about Kuhn's failure to discover other available mitigating evidence.  He also suggests that the exception to the § 2254(d) presumption for findings made in hearings that were not full and fair applies to a finding made on the basis of Kuhn's affidavit alone.

We disagree with Lincecum's characterization of the scope of the state court finding.  Immediately before the language quoted above, the court stated that "[t]he facts related in the affidavit of Robert J. Kuhn filed in this cause pursuant to court order are true, and present an accurate recitation of defense counsel's pretrial and trial preparation and strategy."  Kuhn's affidavit describes not only the mitigating evidence he knew about, but also his inability to locate additional witnesses who could have been beneficial to Lincecum.  The state court's finding is not limited to Kuhn's actions with respect to mitigating evidence he already knew about, but encompasses a conclusion about all of Kuhn's actions in investigating the available mitigating evidence.  It is, therefore, a finding with respect to the facts relevant to Lincecum's claim.

Lincecum also cannot detract from the presumption of

17

correctness by arguing that the state court's decision to rely solely on Kuhn's affidavit deprived him of a full and fair hearing. State courts do not necessarily have to hold live evidentiary hearings for the presumption to attach, but may, in appropriate circumstances, resolve factual disputes on the basis of written affidavits. May v. Collins, ___ F.2d ___, ___ (5th Cir. 1992); Clark v. Collins, ___ F.2d ___, ___ (5th Cir.), cert. denied, ___ S. Ct. ___ (1992). We have held on more than one occasion that the presumption may attach to the findings underlying an ineffective assistance claim when those findings are made on the basis of competing affidavits. Clark, ___ F.2d at ___; Carter, 918 F.2d at 1202; Buxton v. Lynaugh, 879 F.2d 140, 146 (5th Cir. 1989), cert. denied, 110 S. Ct. 3295 (1990). But here the state court was not even faced with competing affidavits, for Lincecum offered nothing more than the conclusory allegations in his pleadings in support of his claim that Kuhn failed to investigate, develop and present relevant mitigating evidence. Kuhn's affidavit was the only evidence on the underlying question of what actions Kuhn had taken and what other sources of mitigating evidence might have been available, so there was no disputed fact question which would even require a hearing. Thus, we cannot conclude that the state court's procedures were so deficient as to strip that court's findings of the presumption of correctness.

The legal conclusion of the state court and the district court that Lincecum was not deprived of effective assistance of

counsel was correct.  This is not a case like <u>Wilson v. Butler</u>, 813 F.2d 664 (5th Cir. 1987), <u>cert.</u> <u>denied</u>, 484 U.S. 1079 (1988), where we held that an evidentiary hearing was necessary to fully explore the petitioner's claim that his counsel had failed to investigate and present evidence of mental impairment as a mitigating factor.  There, the petitioner had adduced a significant amount of evidence, including the affidavit of a psychologist, about his past and present mental impairment.  The petitioner's trial counsel did not assert that he had considered investigating or presenting this evidence.  We held that, because the state court record did not contain evidence sufficient to enable the district court to resolve the claim, and because the evidence put forward by the petitioner showed that counsel's failure to investigate may have been unreasonable and may have prejudiced him in the penalty phase, a hearing was warranted. <u>Id.</u> at 671-73.  Here, however, no hearing is necessary because the state court record contains adequate, relevant evidence on the factual basis for an ineffectiveness claim.  <u>See</u> <u>Prejean v. Smith</u>, 889 F.2d 1391, 1403 (5th Cir. 1989), <u>cert.</u> <u>denied</u>, 494 U.S. 1090 (1990); <u>Joseph v. Butler</u>, 838 F.2d 786, 788 (5th Cir. 1988).  That Lincecum did not present to the state court any concrete indications of what additional mitigating evidence could have been presented does not undermine the adequacy of the record; it merely means that he was unable to raise a genuine

19

dispute of fact about his trial counsel's ineffectiveness.[8]

Lincecum asserts that various family members, including his mother (Louisa Gentry), his grandmother, his younger brothers and his uncle, would have testified regarding his disadvantaged background and diminished mental capacity. He also mentions several persons in the Fort Worth area, including his former girlfriend Sheila Harris, who could have provided similar testimony. Finally, he refers to records of institutions in which he resided which would show limited intelligence, borderline to mild mental retardation and other unspecified mitigating factors. He faults Kuhn for failing to provide this information both to the court-appointed psychologist who evaluated him and to the jury. The only indication that any of his friends and relatives could have provided mitigating evidence, however, comes from the affidavits of Gentry and Christopher Kallaher, Lincecum's counsel in the federal habeas proceeding. Neither requires an evidentiary hearing. Even assuming that Kuhn's failure to contact Gentry was unreasonable, she avers in her affidavit that she would have testified to the fact that she left Lincecum with Eula Belle Moore (her sister) and that Lincecum may have harbored some resentment for this. This is precisely the same testimony Eula Belle Moore gave at trial. Thus, Gentry's testimony would merely have been

---

[8] Lincecum has not suggested that counsel was unable to develop the record in state court due to time constraints imposed by the court, as in Streetman v. Lynaugh, 812 F.2d 950 (5th Cir. 1987).

20

duplicative and could not have had an effect on the jury's decision to assess the death penalty.  See Lavernia v. Lynaugh, 845 F.2d 493, 498 (5th Cir. 1988) (failure to call witnesses whose testimony would have been cumulative on issue of whether defendant spoke English did not prejudice defendant).

As for Kallaher's affidavit, we are loathe to accept the self-serving statements of habeas counsel as evidence that other persons were willing and able to testify on Lincecum's behalf. None of these persons has submitted an affidavit indicating that he or she would have aided Lincecum had he or she been asked, so we are left simply with Lincecum's assertions that unspecified mitigating evidence existed.  Absent any concrete indication of the substance of the mitigating evidence his friends and family would have provided, the law is clear that an evidentiary hearing is not called for.  Byrne v. Butler, 845 F.2d 501, 513-14 (5th Cir.) ("bold assertions on a critical issue in a habeas petition, unsupported and unsupportable by anything else contained in the record, are insufficient to warrant an evidentiary hearing"), cert. denied, 487 U.S. 1242 (1988); see also Joseph, 838 F.2d at 788; Ross v. Estelle, 644 F.2d 1008, 1011 (5th Cir. 1983) (per curiam).

As for the evidence of mental impairment, there is nothing in the record to demonstrate that Kuhn failed to present Lincecum's records to the psychologist aside from the self-serving affidavit of Lincecum's habeas counsel.  There is no affidavit from the psychologist indicating what was presented or

21

suggesting that the records to which Lincecum refers would have altered her evaluation.  The argument that Kuhn was ineffective for failing to present the records as mitigating evidence to the jury, apart from the alleged failure to present them to the psychologist, was never argued to the district court and therefore will not be considered on appeal.  Alexander v. McCotter, 775 F.2d 595, 603 (5th Cir. 1985).  In sum, Lincecum received an adequate hearing on his claim of ineffective assistance in the state court, and the facts found by that court lead to the conclusion that Kuhn acted in a reasonable manner.  He has provided nothing in the federal habeas proceedings that would change this conclusion.

## 2. Unconstitutionality of the Texas Death Penalty Statute

Lincecum also was denied an evidentiary hearing on his claim that the inability of juries accurately to predict future dangerousness renders the Texas capital sentencing statute unconstitutional.  At the time of Lincecum's trial, the Texas capital sentencing statute required the jury, after finding a defendant guilty of capital murder, to answer up to three "special issues" to determine whether the punishment should be death or life imprisonment.  Tex. Code Crim. Proc. Ann. art. 37.071.[9]  First, the jury must decide whether the defendant acted deliberately.  Id. art. 37.071(b)(1).  Next, the jury must

---

[9]   The statute has since been amended, but the new procedures apply only to trials held after September 1, 1991. For discussion, see Graham v. Collins, 950 F.2d 1009, 1012 n.1 (5th 1992) (en banc).

determine whether there is a probability that the defendant would commit acts of violence in the future that would constitute a continuing threat to society.  Id. art. 37.071(b)(2).  In appropriate cases, including this one, the jury may be asked to determine whether the conduct of the defendant was unreasonable in response to provocation by the victim.  Id. art. 37.071(b)(3).  If the jury answers "yes" to all three special issues, punishment is assessed at death.  Lincecum submitted research performed by Professors James Marquart, Sheldon Ekland-Olson and Jonathan Sorensen of Sam Houston State University in which it was concluded that defendants sentenced to death are no more likely to commit violent acts in the future than defendants sentenced to life imprisonment and released into the general prison population.[10]  Lincecum contends that a hearing is necessary to resolve the factual questions raised by this research before a court can review his constitutional claim.  We disagree.

The Supreme Court has never intimated that the factual correctness of the jury's prediction on the issue of future dangerousness, either in a particular case or over time, bears upon the constitutionality of the Texas capital sentencing statute.  In Jurek v. Texas, 428 U.S. 262 (1976), the case in

---

[10] The study compared life-sentenced inmates with defendants whose death sentences were commuted following Furman v. Georgia, 408 U.S. 238 (1972), and inmates whose death sentences under the current Texas statute had been overturned on appeal or commuted by executive authority.  See J. Marquart, S. Ekland-Olson & J. Sorenson, Gazing into the Crystal Ball: Can Jurors Accurately Predict Dangerousness in Capital Cases, 23 Law & Society Rev. 101 (1989).

which the Court upheld the present Texas statute, a majority rejected the argument that the second special issue was vague and meaningless because it is impossible for juries to predict future behavior.  The opinion of Justices Stewart, Powell and Stevens observed that "[i]t is, of course, not easy to predict future behavior.  The fact that such a determination is difficult, however, does not mean that it cannot be made.  Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system."  Jurek, 428 U.S. at 274-75.  After discussing some of the types of predictions of future behavior common in the criminal law, the opinion concluded that "[w]hat is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine.  Texas law clearly assures that all such evidence will be adduced."  Id. at 276.[11]

Later decisions which emphasize the centrality of the defendant's ability to present all relevant mitigating evidence, e.g., Eddings v. Oklahoma, 455 U.S. 104 (1982); Lockett v. Ohio, 438 U.S. 586 (1978), validate Jurek's focus on whether the second special issue allows for consideration of mitigating evidence and not whether juries' actual predictions are correct.  The

---

[11] The Court's later holding in Penry v. Lynaugh, 492 U.S. 302 (1989), does not cast any doubt on the constitutionality of the second special issue per se; it merely holds that where the second special issue does not give the jury an appropriate vehicle to consider certain types of mitigating evidence, a special instruction to the jury is necessary.

reluctance to disturb the predictive element of the second special issue also comports with the requirement that capital sentencing decisions be based on an individualized inquiry into the circumstances of the crime and the characteristics of the particular offender.  See Gregg v. Georgia, 428 U.S. 153, 197 (1976) (opinion of Stewart, Powell & Stevens, JJ.); id. at 221-22 (White, J., concurring in the judgment); McCleskey v. Kemp, 481 U.S. 279, 311 (1987) ("The capital sentencing decision requires the individual jurors to focus their collective judgment on the unique characteristics of a particular criminal defendant.").  In McCleskey, the Court acknowledged that a statistical study revealed the possibility that juries in Georgia impermissibly took race into account in making capital sentencing decisions, but declined to hold on the basis of this evidence that the risk was constitutionally unacceptable.  Id. at 312-13.  The Marquart et al. study is similar to the study in McCleskey in the sense that it suggests that there is a risk that juries are unable to make correct predictions about future dangerousness.  The Court acknowledged this risk and tolerated it in Jurek, and has done nothing in the ensuing years that would suggest it considers the risk constitutionally unacceptable.  Accordingly, because Lincecum's claim would fail as a matter of law, he is not entitled to an evidentiary hearing.

C. Instruction on Mitigating Evidence

Relying on the principle of Penry v. Lynaugh, 492 U.S. 302 (1989), Lincecum next argues that the application of the Texas

25

capital sentencing statute was unconstitutional in this case because, absent a special instruction, the jury could not give proper consideration to his mitigating evidence. He also suggests that the statute is unconstitutional because it prevented the presentation of certain other mitigating evidence.

Initially, we note that Lincecum's trial counsel's failure to request an instruction on the uses the jury may make of mitigating evidence does not operate as a state procedural bar which would preclude federal review. Under Texas law, a Penry claim is preserved even if no instruction on mitigating evidence is requested or no objection is made to the instructions given at trial. Selvage v. Collins, 816 S.W.2d 390, 392 (Tex. Crim. App. 1991) (answering certified question from Fifth Circuit); Black v. State, 816 S.W.2d 350 (Tex. Crim. App. 1991). On the other hand, it is by now well-settled that no Penry claim can arise with respect to mitigating evidence that could have been, but was not, introduced at trial. May v. Collins, 904 F.2d 228, 232 (5th Cir. 1990), cert. denied, 111 S. Ct. 770 (1991); DeLuna v. Lynaugh, 890 F.2d 720, 722 (5th Cir. 1989). Thus, the only claim we consider is the claim that Lincecum was entitled to an instruction to guide the jury's consideration of his mitigating evidence.[12]

Lincecum's mitigating evidence consisted primarily of the

---

[12] Despite the fact that Lincecum's conviction became final before Penry, the rule of Penry may be applied retroactively because it does not enunciate a "new" rule for purposes of Teague v. Lane, 489 U.S. 288 (1989). See Penry, 492 U.S. at 315.

testimony (during the guilt-innocence phase) of his aunt, Eula Belle Moore. She testified that she had raised Lincecum until the age of four because his mother was still in high school when he was born. At four, Lincecum moved back with his mother in Fort Worth. She further testified that in June 1985, two months before Kathy Coppedge was murdered, she noticed that Lincecum "was disturbed," "was down under," and "was very quiet." She "felt he needed to talk to somebody," so she recommended to Lincecum's parole officer, Mary Kathryn Hebert, that Lincecum obtain psychiatric counseling. Moore also testified that she told Hebert that she thought Lincecum always felt his mother did not care for him. Hebert corroborated the substance of these discussions with Moore.

As noted earlier, the Supreme Court in Jurek upheld the constitutionality of Texas' decision to have the jury answer two or three specific questions in order to determine whether a death sentence is warranted. The Court was satisfied that the second special issue, as construed by the Texas Court of Criminal Appeals, satisfied the Eighth Amendment's requirement that the jury be permitted to consider any and all mitigating evidence which might counsel against a death sentence. See Jurek, 428 U.S. at 272 (opinion of Stewart, Powell & Stevens, JJ.). The Court reaffirmed this view of the Texas statute in Franklin v. Lynaugh, 487 U.S. 164 (1988), holding that no special instruction was necessary to enable the jury to consider the mitigating effect of the petitioner's evidence that he had a good prison

27

disciplinary record. The plurality pointed out that "Lockett[ v. Ohio, 438 U.S. 586 (1978)] does not hold that the state has no role in structuring or giving shape to the jury's consideration of . . . mitigating factors," id. at 179, and the concurrence found that the petitioner's evidence had no relevance as mitigating evidence beyond the scope of the special issues. Id. at 185 (O'Connor, J., concurring).

The following year, however, the Court held in Penry that the special issues gave the jury no vehicle to express the view that Penry's evidence of organic brain damage, mental retardation and a troubled childhood reduced his culpability for the crime. See Penry, 492 U.S. at 323. Penry's evidence had relevance to a negative answer to the first special issue (deliberateness) but also had relevance as a mitigating factor beyond the scope of the finding the jury was instructed to make. As for the second special issue, Penry's evidence was likely to have caused the jury to consider Penry a future danger, while at the same time reducing his moral culpability for the crime. Id. at 323-24. The evidence was not considered to have any relevance to the inquiry demanded by the third special issue. Thus, the Court concluded that without an instruction that the jury could consider the effect of Penry's evidence apart from the special issues, Penry's sentence was imposed in violation of the Eighth Amendment.

Our recent en banc opinion in Graham v. Collins, 950 F.2d 1009 (5th Cir. 1992) (en banc), confirmed that, despite Penry,

28

"Jurek continues to apply, in instances where no major mitigating thrust of the evidence is substantially beyond the scope of all the special issues." Graham, 950 F.2d at 1027. Graham had proffered as mitigating his youth at the time of the crime, his respect for his family, his lack of a history of violence, his studiousness, and the fact that his mother had a "nervous condition." Id. at 1032-33. The most difficult question was whether the special issues allowed for adequate consideration of Graham's youth. We determined that, although Graham may have been less culpable because he was young, he was "also less likely to be dangerous when no longer young." Id. at 1031. We concluded, therefore, that because youth suggested a "no" answer to the second special issue, it "afford[ed] an adequate vehicle by which the jury can give effect to the mitigating aspect of youth." Id. The other mitigating evidence (aside from Graham's mother's illness) we considered akin to the "good character" evidence which was proffered in Jurek and which the Court there found could be taken into account by the second special issue. As for the evidence of Graham's mother's illness, we pointed out that there had been no indication that this had ever had an adverse effect on Graham. Id. at 1033. Thus, we concluded that Graham was not entitled to a special instruction to guide the jury's consideration of his mitigating evidence.

Lincecum contends that Graham sharpens the contrast between what is and is not "Penry-type" evidence. We agree, but do not believe that the conclusion necessarily follows that simply

29

because Lincecum's mitigating evidence did not consist of the transitory factor of youth, it falls in the category of Penry-type evidence. The evidence Lincecum has emphasized most strenuously throughout these proceedings is that of a troubled childhood. Yet close examination of Moore's testimony at trial reveals that she merely stated that Lincecum had been left to live with her for the first four years of his life because his mother was very young when he was born. Viewing this testimony in the most favorable light possible, this hardly demonstrates the kind of troubled childhood marked by savage abuse that was present in Penry. As with the evidence that Graham's mother had a nervous condition, there is simply no showing that living with his aunt produced such a turbulent and unsteady family situation that Lincecum suffered from emotional problems which would reduce his moral culpability for his crime. Moore gave no details about Lincecum's childhood apart from his place of residence for the first four years of his life, and none appear in the record. The only indication that this had a lasting emotional effect on Lincecum comes from Moore's opinion that Lincecum thought his mother did not care for him. This is hardly evidence of "a disturbed childhood and adolescence which left him bitter and resentful," as Lincecum claims.

Moore's testimony that in June 1985 Lincecum seemed "disturbed," was "quiet," and seemed like he needed to talk to someone likewise does not fall within the category of Penry evidence necessitating a special instruction. In Graham, we

30

characterized "being under some particular emotional burden at the time [of the crime]" as similar to youth in that its transitory nature can be taken into account in answering the second special issue. 950 F.2d at 1029. Assuming that Moore's testimony could be construed by the jury as indicating that the crime was in some way connected to whatever emotional problems are implicated by seeming "disturbed" and being "quiet," the jury could find that the crime was an atypical reaction to the difficulties Lincecum was suffering at the time and could express this view by finding that he would not pose a continuing threat to society.

On the other hand, to the extent Moore's testimony showed that Lincecum had emotional difficulties the significance of which transcended the special issues, our opinion in Graham leads to the conclusion that the evidence falls short of that proffered in Penry. In Graham, we emphasized the importance of the fact that Penry's evidence showed he was burdened, through no fault of his own, with "uniquely severe permanent handicaps" including mental retardation, organic brain damage, and an abused childhood. 950 F.2d at 1029. Lincecum's evidence consisted merely of the inexpert opinion of his aunt about his state of mind, hardly the kind of comprehensive evaluation offered in Penry's case. The source of his quietness and disturbance was not explored and was not connected to any particular events or past conditions. In short, if Penry represents "a set of atypical circumstances . . . where the defense's mitigating

31

evidence would have either no substantial relevance or only adverse relevance to the second special issue," Graham, 950 F.2d at 1029, it cannot form the basis for relief here.

### III. CONCLUSION

For all the foregoing reasons, the district court's denial of habeas relief is AFFIRMED, and the stay of execution previously entered by this court is VACATED.