UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
No. 91-5512

RUBEN MONTOYA CANTU,

Petitioner-Appellant,

versus

JAMES A. COLLINS, Director,
Texas Department of Corrections,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Western District of Texas
_____

July 22, 1992

Before GARWOOD, JONES, and DUHÉ, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Ruben Montoya Cantu challenges his murder conviction and
death sentence. His application for a writ of habeas corpus was
denied by the district court, but the court granted a certificate
of probable cause.

## I.

### FACTS AND PROCEDURAL HISTORY

A Bexar County, Texas grand jury convicted petitioner for
the November 8, 1984 murder of Pedro Gomez during the commission of
a robbery, in violation of § 19.03(a)(2) of the Texas Penal Code
(Vernon Supp. 1984). The murder took place at the house of Eusebio
Moreno in San Antonio. The house was under construction, and
because Moreno had been experiencing numerous incidents of theft

from the building site, his brother, Juan Moreno, and brother-in-law, Pedro Gomez, were sleeping in the house to prevent any further loss. Some time after 10:30 p.m., Gomez and Juan Moreno were awakened by two intruders: a man who was poking Moreno with a rifle, whom he later identified as the petitioner, and an accomplice.[1] Cantu and his companion took wristwatches from Moreno and Gomez, as well as Gomez's wallet. Cantu then told Gomez to pull back the mattress on one of the beds, under which a pistol owned by Eusebio Moreno was wrapped in a rag. According to Moreno, as Gomez was handing the bundle to the petitioner, Cantu shot him once in the head. Gomez fell to the ground, and Cantu shot him eight more times. Petitioner next trained his rifle on Juan Moreno, shooting him eight or nine times.

Gomez died from multiple gunshot wounds to the body and head. Juan Moreno survived.

On November 14, two detectives from the San Antonio Police Department visited Juan Moreno at the intensive care unit at Wilford Hall Medical Center. The detectives showed him photographs of possible suspects. Cantu's photograph was not in the photo spread, and Moreno did not identify any of the photos.

---

[1] The accomplice was later identified as David Garza, a juvenile. According to evidence adduced at trial, the room in which Juan Moreno and Gomez were sleeping was equipped with a 75-watt bulb, which lighted the room well. The lamp had been turned off when the two men went to sleep, but was on later that night when Cantu awakened Moreno. Moreno testified that the lamp illuminated the faces of Cantu and his accomplice, and that he knew Cantu because he had seen him in the neighborhood before.

On December 16, detectives again visited Juan Moreno at Wilford Hall and showed him a photo array, which this time included a photo of Cantu. Moreno did not identify Cantu and did not look at his photograph. The detectives later testified that Moreno avoided looking at petitioner's picture, adding that it was their opinion that he knew more than he was saying. According to one of the detectives, when asked if he was afraid to identify the assailant, Moreno replied, "Yeah." Both detectives who visited Moreno at Wilford Hall on that day testified that he appeared to be frightened as he looked through the photo spread.[2] Detective Garza

---

[2]     One of the officers, Detective Garza, conversed with Moreno in Spanish. Garza testified that when he asked Moreno, "Are you afraid to identify the guy who did this?" Moreno replied, "Yeah." Garza said he was prompted to ask the question because Moreno "completely avoided the photograph, and you could see it in his face that he was scared." The second officer, Detective Herring, testified that when Moreno "reached Mr. Cantu's picture, he completely didn't look at it. He just passed it up twice." Herring added that out of the five photographs he viewed, Cantu's was the only picture that Moreno avoided. As Herring testified at trial:

> Q.   So [Moreno] did not treat any of the other photographs the way he treated Mr. Cantu's picture?
>
> A.   No, sir, he did not.
>
> Q.   Now, based on your experience, Detective Herring, have you had experienced before when people declined to pick out a photograph when you have reason to believe that they know who the person is?
>
> A.   Many times.
>
> Q.   And is what you saw on December 16, regarding Mr. Moreno's behavior, consistent with that pattern that you experienced before?

added that Moreno did recognize some of the other men in the photo lineup, "but he advised me that these people were just from the neighborhood and they were not any of the individuals involved in the shooting of him or Pedro Gomez." Moreno also for the first time offered a general description of his assailants: two Hispanic males, one about 13 or 14 years old, the other about 19 and wearing blue jeans.

Four months later, on March 1, 1985, petitioner was involved in a bar shooting with an off-duty San Antonio police officer, Joe De La Luz. At the time of the De La Luz shooting, Cantu was already a suspect in the murder of Pedro Gomez. Because Cantu was a suspect in both cases, San Antonio police renewed their efforts to obtain a positive identification in the Gomez murder investigation. Accordingly, the day after the De La Luz shooting, an officer was assigned to interview Juan Moreno at his home. The officer, Detective Ballesa, showed Moreno five photographs different from those which he had viewed on December 16, except for the photo of Cantu, which appeared in both arrays. Once again, Moreno did not identify anyone in the photographs. Detective Ballesa then engaged Moreno in a discussion, advising him that he had to identify the assailants if he knew their identity. Moreno

---

A.    Yes, sir, it is.

4

then provided the name of Ruben Cantu when viewing his picture but did not identify him as Gomez's murderer.[3]

The next day, on March 3, 1985, a different officer, Detective Quintanilla, went to the home of Eusebio Moreno for the specific purpose of taking Juan Moreno to the police station to

---

[3]   As Detective Ballesa testified at trial:

Q.   Had you mentioned Ruben Cantu's name to [Moreno]?

A.   No, sir.

Q.   But he told you that Ruben Cantu had shot him?

A.   Yes, sir.

Q.   What did he say when he got to Ruben Cantu's photograph?

A.   Well, he didn't say anything.  He mentioned the name after -- after the array had been shown to him, you know, and after there was some discussion on the matter is when he came up with the name.

Q.   And what was this discussion?

A.   Well, the discussion centered around I was trying to make the man comfortable; he was scared and visibly shaken; he didn't want to identify the photograph, and it became rather obvious that that was the problem.  So, you know, he was trying to -- to get me to say that we'd be able to protect him, things of this nature, if he identified the picture. He said, "Look, if I give you the name, why isn't that good enough?"  I said, "Well, that isn't."  I said, "You have to identify the photograph," and he wouldn't do it, but, you know, he definitely gave me the name.

5

show him the photo spread once more. At the station, Detective Quintanilla showed Juan Moreno the same photo spread containing the picture of petitioner that had been shown to him the day before by Detective Ballesa. This time, Moreno identified Cantu's photo as representing the man who had shot him and Gomez. Quintanilla testified that when he asked Juan Moreno why he had failed to identify Cantu previously, Moreno replied that "he had recognized the photo the day before; he just was afraid, scared."[4] At trial, Juan Moreno identified Cantu in court, adding that he had recognized him in the photo line-ups he viewed on December 16, 1984, and March 2, 1985, but did not identify his photo on those occasions because, "I didn't want to get into any problems."[5]

In addition to Juan Moreno's trial testimony, the state's witnesses included Dr. Suzana Dana, a forensic pathologist and the deputy chief medical examiner of Bexar County. Dr. Dana testified

---

[4] Detective Ballesa explained that he understood Moreno's fear because Cantu belonged to the "Grey Eagles," a youth gang known for violent behavior.

[5] As described by the Texas Court of Criminal Appeals:

> Juan testified that he had recognized appellant in the photographs that were shown to him on all the occasions. He did not tell the police that it was appellant because he did not want appellant to know where he and his family lived. He was afraid for his life and the lives of his family. He said the police never told him they knew appellant was the one who shot him. He also stated that he knew appellant by sight because he had seen him two or three times before the night of the murder.

Cantu, 738 S.W.2d at 251.

6

that she performed the autopsy on Pedro Gomez, who had nine gunshot wounds to the body, including a "defensive" wound to the left forearm that was consistent with the victim attempting to shield his face or body with his hands. Gomez was killed by shots from a rifle, Dr. Dana continued, because there was no powder tattooing as would typically have been present had the shots been fired by a weapon with a shorter muzzle, such as a handgun. This and other forensic evidence suggested that the victim was probably shot from one and one-half to two feet away. Dr. Dana also analyzed gunpowder traces on the palms of Gomez's hands, comparing them to the relative absence of gunpowder particles on the backs of his hands. She concluded that these findings were consistent with "a gun being fired at the hands, or with the hands open simply because the levels are higher on the palms than on the backs." In response to questions from defense counsel, Dr. Dana opined that it was unlikely that Gomez had fired a weapon at Cantu because that would have left gunpowder residue on the backs of Gomez's hands; clutching the gun would have shielded his palms from gunpowder.[6]

---

[6] The detective who investigated the murder scene recovered eleven .22 caliber shell casings and some slugs. The detective testified that there were a number of bullet holes in the walls of the house, adding that two of the slugs found at the scene may have been larger than .22 caliber slugs. In his brief to this court, the petitioner suggests that these two slugs were fired from a .38 caliber handgun such as that hidden by Eusebio Moreno under the mattress. Petitioner strongly implies that this evidence supports his claim that he shot Moreno and Gomez in self-defense. This assertion is tenuous at best, however, both because the detective could not identify the slugs as .38 caliber, and because investigators recovered no .38 caliber shell casings.

Cantu did not testify at the guilt-innocence phase of the trial. Other than recall Juan Moreno and the police officers who conducted the photographic lineups in an attempt to discredit Moreno's identification testimony, the only other witness offered by the defense provided an alibi for Cantu. At the punishment phase of the trial, the prosecution presented five witnesses who testified to Cantu's bad reputation in the community. Officer De La Luz also testified that he was in the Scabaroo Lounge in San Antonio on the night of March 1, 1985, when Cantu shot him several times without provocation. Cantu then offered the testimony of six San Antonio police officers in an attempt to discredit De La Luz's testimony. The defense also recalled De La Luz to the stand and questioned him further about the shooting at the Scabaroo Lounge. At this point, the defense sought to have Cantu testify for the limited purpose of rebutting De La Luz's version of Cantu's assault on him. The trial court sustained the government's objection to this proposal, ruling that "when Ruben Cantu takes the stand, he is subject to the same grounds, the same areas of cross-examination as any other witness." In response to questions from defense counsel, the trial court added:

> THE COURT: The ruling is that you may offer any and all evidence that you care to offer through this witness. If you want to limit it to exactly what he said on your direct, that's fine; but when you pass him for cross-examination, he will be subject to cross-examination to the same [sic] as all other witnesses, only exceptions are any and all rules of evidence that apply to any and all witnesses, regarding the admissibility of evidence.

8

The defense declined to put Cantu on the stand under the conditions set by the court but did perfect a bill of exception at which Cantu testified outside the presence of the jury. Cantu essentially claimed that De La Luz provoked the confrontation which led to the Scabaroo Lounge shooting, adding that he shot De La Luz with a pistol Cantu had purchased outside the bar earlier that evening.

Cantu was convicted of capital murder and sentenced to death on July 30, 1985. He appealed to the Texas Court of Criminal Appeals, which on February 4, 1987 affirmed his conviction and sentence. Cantu v. State, 738 S.W.2d 249 (Tex. Crim. App. 1987). That court later denied Cantu's motion for rehearing, and the Supreme Court denied certiorari. Cantu v. Texas, 484 U.S. 872, 108 S. Ct. 203, 98 L.Ed.2d 154 (1987). Cantu was slated to be executed on or before sunrise on January 8, 1988. He filed a post-conviction habeas application, which the Texas Court of Criminal Appeals denied. Cantu then filed a federal habeas application and motion for stay of execution, which was granted on January 7, 1988. After an evidentiary hearing, a federal magistrate recommended that habeas corpus relief be denied. The district court later accepted the magistrate's report and denied the writ, prompting this appeal.

In his brief, petitioner raises seven challenges to his conviction and death sentence, framing them as follows:

I. The Texas capital sentencing statutes precluded the jury from giving full effect to Mr. Cantu's mitigating evidence of youth, in violation of the Eighth and Fourteenth Amendments.

II. Petitioner was deprived of his constitutional rights under the Fifth, Eighth and Fourteenth Amendments by the trial court's refusal to instruct the jury on the lesser included offense of voluntary manslaughter.

9

III. The in-court identification of petitioner deprived him of due process of law under the Fifth and Fourteenth Amendments as the procedures employed by the San Antonio police departments were so impermissibly suggestive as to lead to a very substantial likelihood of irreparable misidentification.

IV. Petitioner was denied effective assistance of counsel at trial in violation of the Sixth and Fourteenth Amendments because trial counsel failed to request the services of an expert witness on the issue of eyewitness identification.

V. Petitioner was denied his Sixth and Fourteenth Amendment rights to the effective assistance of counsel through the punishment phase of his criminal trial.

VI. Petitioner was denied his Sixth and Fourteenth Amendment right to the effective assistance of counsel on appeal.

VII. Petitioner's constitutionally protected right to present evidence to the jury in mitigation of his sentence of death was impermissibly chilled by the Texas state rule which precludes a defendant, who testifies at the penalty phase of his trial, from challenging the sufficiency of the evidence in support of his guilt or the admissibility of the identification evidence.

We address each argument in turn.

## II.

### MITIGATING EVIDENCE

Petitioner first contends that the Texas capital sentencing statute did not provide a vehicle by which the jury could consider and give mitigating effect to his youth.[7]

---

[7] Texas Code Crim. Pro. Ann. Art. 37.071 (Vernon Supp. 1985) provides in relevant part:

> (b) On conclusion of the presentation of the evidence, the court shall submit the following three issues to the jury:
>
> (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with a reasonable expectation that the death of the deceased or another would result;

Petitioner admits that his trial counsel did "argue the issue of Mr. Cantu's youth . . . as a basis for compassion."  Indeed references to Cantu's age surfaced repeatedly during the punishment phase of his trial.  At one point, for instance, Cantu's counsel told the jury:  "I think that when a man is on trial for his life, and even more so when a boy is on trial for his life, that it warrants a substantial investment of time."  In support of its request for an affirmative finding on the second special issue, the state argued along the following lines:  "He's been referred to as a boy, a kid, a young man," the prosecutor noted at one point.  "Well, he was an 18 year old with 18 rounds of ammunition, and he used them all."[8]

---

> (2)  whether there is a probability that the defendant would commit criminal acts of violence which would constitute a continuing threat to society; and
>
> (3)  if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

In May 1991, the Texas legislature passed two bills amending art. 37.071(b).  However, these changes, which were later enacted into law, apply only to offenses committed on or after September 1, 1991.  See Graham v. Collins, 950 F.2d 1009, 1012 n.1 (5th Cir. 1992) (en banc), cert. granted, _____ U.S. _____, _____ S. Ct. _____, 1992 WL 52201 (June 8, 1992).

[8]     While Cantu was 18 years old at the time of his state criminal trial, he was 17 at the time of the murder.  We reject Cantu's assertion that the state's argument amounted to a claim that the special issues, or any of them, should be answered in the affirmative because of Cantu's youth.  The most reasonable characterization of the state's argument is that Cantu was streetwise and hardened beyond his chronological age, and that in this particular setting his chronological age was not a reasonable basis on which to return a negative answer to any of

11

Notwithstanding the numerous references to the petitioner's age, he insists that the jury's consideration of mitigating evidence of his youth was unconstitutionally circumscribed by Art. 37.071(b). Specifically, he maintains that while the second special issue allowed the prosecution to use his youth as a sword against him -- by drawing the jury's attention to his potential for future dangerousness -- it effectively prevented him from using his youth as a shield against a death sentence. Thus, petitioner's brief continues, "the jury was left with no vehicle through which it might express a 'reasoned moral response' that, because of Mr. Cantu's youth, he should not be condemned to die."[9]

Cantu grounds his theory that Art. 37.071 failed to permit the jury to consider mitigating evidence of his youth on Penry v. Lynaugh, 492 U.S. 302, 109 S. Ct. 2934, 106 L.Ed.2d 256 (1989). We have, however, in an en banc decision recently rejected the theory that Penry calls into question the constitutionality of the Texas death penalty statute as applied to the arguably mitigating circumstance of youth. In Graham v. Collins, 950 F.2d 1009, 1017 (5th Cir. 1992) (en banc), cert. granted, _____ U.S.

_____

the special issues.

[9] The district court found that petitioner had procedurally defaulted this claim for federal habeas review because of his failure to raise it at trial. However, in light of the Texas Court of Criminal Appeals' decision in Selvage v. Collins, 816 S.W.2d 390 (Tex. Crim. App. 1991) (en banc), which called into question whether a procedural bar would apply in such cases, the state briefed the merits of Cantu's claim on this issue.

12

_____, _____ S. Ct. _____, 1992 WL 52201 (June 8, 1992), we concluded "that <u>Penry</u> does not invalidate Texas's statutory scheme, . . . in instances where no major mitigating thrust of the evidence is substantially beyond the scope of all the special issues." <u>Id</u>. at 1027.[10] <u>See</u> <u>also</u> <u>Black v. Collins</u>, _____ F.2d. _____, 1992 WL 107848 (5th Cir. 1992); <u>Holland v. Collins</u>, _____ F.2d _____, 1992 WL 107830 (5th Cir. 1992); and <u>Romero v. Collins</u>, _____ F.2d ____, 1992 WL 105059 (5th Cir. 1992). <u>Graham</u> held: "At the very least, <u>Jurek</u> must stand for the proposition that these mitigating factors -- relative youth and evidence reflecting good character traits such as steady employment and helping others -- are adequately

---

[10]     Like Cantu, Graham was 17 years old at the time the offense was committed. <u>Id</u>. at 1015 n.9. The Court's grant of certiorari in a capital case does not cause us to deviate from circuit law, nor is it grounds for a stay of execution. <u>See</u> <u>Johnson v. McCotter</u>, 804 F.2d 300, 301 (5th Cir. 1986), <u>cert. denied</u>, <u>Johnson v. Lynaugh</u>, 481 U.S. 1042, 107 S. Ct. 1988, 95 L.Ed.2d 827 (1987).

13

covered by the second special issue." Id. at 1029.[11] In Cantu's

case, we agree with Graham that

> [t]o the extent that [Cantu's] criminal
> conduct was a product of his youth, he was for
> that reason not only less culpable but, to the
> same extent, also less likely to be dangerous
> when no longer young. To the extent [Cantu's]
> criminal conduct was not attributable to his
> youth, his youth neither reduced his
> culpability nor his future dangerousness.
> Nothing in the present record suggests that
> the jury here might have viewed the matter in
> any other light.

Id. at 1031 (footnote omitted). Cantu's youth could adequately be

taken into account as a mitigating factor in answering the special

issues, particularly the second. Graham, 950 F.2d at 1033.[12]

---

[11] See Jurek v. Texas, 428 U.S. 262, 96 S. Ct. 2950, 49 L.Ed.2d 929 (1976) (sustaining the constitutionality of the Texas capital sentencing scheme). Moreover, Graham noted that both before and after Penry, the Texas Court of Criminal Appeals has continued to hold that the second special issue provides an adequate vehicle for the jury to take into account the defendant's youth. 950 F.2d at 1031. See Roney v. State, 632 S.W.2d 598, 603 (Tex. Crim. App. 1982); Robinson v. State, 548 S.W.2d 63, 64 (Tex. Crim. App. 1977); Earvin v. State, 582 S.W.2d 794, 798-99 (Tex. Crim. App. 1979), repudiated on other grounds, Mercado v. State, 615 S.W.2d 225, 227 n.1 (Tex. Crim. App. 1981); Brasfield v. State, 600 S.W.2d 288, 293 n.3 (Tex. Crim. App. 1980), overruled on other grounds, Janecka v. State, 739 S.W.2d 813 (Tex. Crim. App. 1987); Keeton v. State, 724 S.W.2d 58, (61 Tex. Crim. App. 1977); Ex Parte McGee, 817 S.W.2d 77, 80 (Tex. Crim. App. 1991); Lackey v. State, 819 S.W.2d 111 (Tex. Crim. App. 1991); Trevino v. State, 815 S.W.2d 592, 622 (Tex. Crim. App. 1991), reversed on other grounds, Trevino v. Texas, _____ U.S. _____, 112 S. Ct. 1547, 118 L.Ed.2d 193 (1992). See also DeLuna v. Lynaugh, 890 F.2d 720, 722 (5th Cir. 1989) (habeas corpus).

[12] While petitioner focuses on the second special issue, we also agree with the state's contention that the first special issue permitted Cantu to present mitigating evidence of "a youthful tendency to act rashly," and therefore not deliberately. Unlike Penry, Cantu's ability to think about the consequences of his actions was markedly different from Penry's evidence of mental retardation, which he contended made it uniquely difficult

14

## III.

## LESSER INCLUDED OFFENSE

Petitioner next contends that the state trial court erred when it refused to include in its jury charge petitioner's requested instruction on the lesser included offense of voluntary manslaughter. At the conclusion of the evidence, his counsel requested that the jury be so instructed, but the trial court sustained the state's objection. Subsequently, during the charge conference at the penalty phase of the trial, petitioner's counsel asked the court to submit Special Issue No. 3 as provided by Art. 37.071(b)(3). The prosecution did not object to this requested submission, despite its earlier opposition to a voluntary manslaughter instruction during the guilt/innocence phase of the trial. Citing this asserted inconsistency, petitioner argues that the third special issue would not have been submitted at the penalty phase unless the evidence in the record suggested that the killing occurred in response to provocation by the deceased.[13] The evidence presented at his trial, Cantu contends, could have

---

to control his impulses or to evaluate the consequences of his conduct. Penry, 492 U.S. at 324, 109 S. Ct. at 2949.

[13] Petitioner argues that in Texas, voluntary manslaughter is considered a lesser included offense of murder. See Braudrick v. State, 572 S.W.2d 709, 710 (Tex. Crim. App. 1978). Braudrick was later questioned by an en banc panel of that court. Bradley v. State, 688 S.W.2d 847 (Tex. Crim. App. 1985) (en banc). Bradley held that voluntary manslaughter may be properly considered a lesser included offense of murder only if the evidence raises the issue of sudden passion. Id. at 851. Because Cantu argued the sudden passion issue at trial, we agree that voluntary manslaughter was properly treated as a lesser included offense in this case.

15

supported a verdict that he was guilty only of voluntary manslaughter, and the trial court's refusal to give such instruction therefore violated his constitutional rights.

Under the standard first announced in Beck v. Alabama, 447 U.S. 625, 100 S. Ct. 2382, 65 L.Ed.2d 392 (1980), "the jury [in a capital case] must be permitted to consider a verdict of guilt of a noncapital offense 'in every case' in which 'the evidence would have supported such a verdict.'" Hopper v. Evans, 456 U.S. 605, 610, 102 S. Ct. 2049, 2052, 72 L.Ed.2d 367 (1982) (citing Beck, 447 U.S. at 627, 100 S. Ct. at 2384). Under Beck, a defendant is entitled to instruction on a lesser included offense only "if the evidence would permit a jury rationally to find him guilty of the lesser offense and to acquit him of the greater." Id. at 2388 (quoting Keeble v. United States, 412 U.S. 205, 208, 93 S. Ct. 1993, 1995, 36 L.Ed.2d 844 (1973)). See also Lincecum v. Collins, 958 F.2d 1271 (5th Cir. 1992); and Cordova v. Lynaugh, 838 F.2d 764 (5th Cir.), cert. denied, 486 U.S. 1061, 108 S. Ct. 2832, 100 L.Ed.2d 932 (1988).[14]

The voluntary manslaughter statute, Tex. Penal Code Ann. § 19.04, provides in relevant part:

§ 19.04 Voluntary Manslaughter

(a) A person commits an offense if he causes the death of an individual under circumstances that would constitute murder under Section

---

[14] "Although Beck itself spoke only to a statute under which the judge could not give the requested instruction, [its] rationale applies equally to cases in which a trial judge refuses to give an instruction which is available under state law." Lincecum, 958 F.2d at 1275.

16

19.02 of this code, except that he caused the death under the immediate influence of sudden passion arising from an adequate cause.

Sudden passion is defined as "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." Tex. Penal Code Ann. § 19.04(b). Adequate cause is defined as "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." Tex. Penal Code Ann. § 19.04(c).

We agree with the district court and with the state courts that no rational jury could conclude that Cantu shot Gomez under the influence of sudden passion, thereby warranting an instruction of voluntary manslaughter. Juan Moreno, the only witness who testified at trial as to what happened at the time of the shooting, stated that Pedro Gomez did not fire the .38 caliber handgun he was attempting to hand over to Cantu. Petitioner's attempt to characterize police testimony as supporting his claim that some of the bullet holes in the wall were caused by a .38 caliber gun, instead of the .22 caliber murder weapon, does not accurately reflect what the investigating officer said. In fact, the officer stated that he was unsure whether the bullet holes, or slugs found at the scene, were .38 caliber. Nor has Cantu offered a plausible explanation linking this physical evidence to his claim that he acted in self-defense. His unsupported conjecture is

hardly probative on the issue of whether he acted under the immediate influence of sudden passion.  See, e.g., Hobson v. State, 644 S.W.2d 473, 478 (Tex. Crim. App. 1983).

Yet even assuming for the sake of argument that Cantu acted upon sudden passion within the meaning of § 19.04(b), that passion did not arise from an adequate cause as required by § 19.04(c).  See Hobson, id.  It is undisputed that Cantu initiated the criminal episode in question when he and an accomplice entered Eusebio Moreno's house, awakened Gomez and Juan Moreno at gunpoint, robbed them, and repeatedly shot them with a rifle at point-blank range, killing one man and seriously wounding the other.  We have recently noted that "Texas law plainly does not consider adequate cause to arise under these circumstances."  Lincecum, 958 F.2d at 1277.[15]  See also Penry v. State, 691 S.W.2d 636 (Tex. Crim. App. 1985), cert. denied, 474 U.S. 1073, 106 S. Ct. 834, 88 L.Ed.2d 805 (1986); and Goff v. State, 681 S.W.2d 619 (Tex. App. -- Houston [14th Dist.] 1983), aff'd, 720 S.W.2d 94 (Tex. Crim. App. 1986). Because state law prevented the jury from finding that Cantu

---

[15]    In Lincecum, the petitioner invoked Beck to support his claim that the trial court erred by refusing to instruct the jury on voluntary manslaughter.  Lincecum was convicted of capital murder for killing Kathy Ann Coppedge during the course of a kidnapping, robbery and attempted sexual assault.  Evidence adduced at trial indicated that after robbing Coppedge and ordering her to take off her clothes, Coppedge managed to grab Lincecum's knife and stab him in the side.  On collateral appeal, Lincecum insisted that in light of this evidence, a voluntary manslaughter instruction was constitutionally required.  In rejecting this claim, this court noted that even assuming Lincecum acted under sudden passion, he lacked adequate cause because he initiated the criminal episode in which the stabbing occurred.  958 F.2d at 1277.

18

committed voluntary manslaughter, the trial court's failure to instruct the jury on this offense was not constitutional error.

## IV.

### IN-COURT IDENTIFICATION

Petitioner next takes issue with the identification procedures used by the San Antonio Police Department. Specifically, he contends that the repeated showing of his photograph to Juan Moreno was so impermissibly suggestive as to create a very substantial likelihood of irreparable mis-identification. Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 971, 19 L.Ed.2d 1247 (1968). Even unnecessarily suggestive procedures do not automatically require suppression, however, if the witness's identification is reliable under the totality of the circumstances. Manson v. Braithwaite, 432 U.S. 98, 114, 97 S. Ct. 2243, 2254 (1977).

During the state court proceedings, Cantu moved to suppress the in-court identification, arguing that Moreno had been unfairly influenced by police officers. The trial court disagreed, finding that the photo array containing Cantu's picture was not unduly suggestive, nor was Moreno's identification in any way tainted.[16] In denying the suppression motion, the court ruled that Moreno's testimony "established that he knew who the defendant was,

---

[16] Among other things, the court noted that Moreno had initially made a sign of recognition when first shown Cantu's photograph. Moreno's obvious unease when shown the photo adequately accounted for his initial uncertainty in identifying him. Additionally, the trial court found that the in-court identification was separate from the photo line-up and was based on Moreno's recollection of the shooting.

19

what the defendant looked like, and was able to identify him without the aid of any photograph to assist him in his recollection of who the person was who shot him. . . ." On direct appeal, the Texas Court of Criminal Appeals acknowledged that the repeated showing of Cantu's picture during the photo arrays was suggestive. Cantu v. State, 738 S.W.2d 249 (Tex. Crim. App. 1987). However, that court rejected the petitioner's contention that the suggestive procedures tainted Moreno's in-court identification so as to create a substantial likelihood of irreparable misidentification. Id. at 252.

Under 28 U.S.C. § 2254(b), state court factfindings are entitled to a presumption of correctness absent one of eight statutory exceptions. Sumner v. Mata, 449 U.S. 539, 101 S. Ct. 764, 66 L.Ed.2d 722 (1981). Petitioner insists that the presumption of correctness should not be afforded here because the state factfinding was insufficient. According to Cantu, the presumption does not apply because "the trial court made no factual findings regarding the identification process, or the procedures employed, but merely arrived at a legal conclusion." He specifically faults the trial court for failing to make explicit factfindings on several issues, such as the brightness of the lighting in the room at the time of the murder, which he insists should bear on whether Moreno correctly identified Cantu as his and Gomez's assailant.

Petitioner's argument is totally without merit. That the trial court did not make explicit fact findings on every issue does

20

not mean the court "merely arrived at a legal conclusion" unworthy of the presumption of correctness. Both implied and explicit factfindings fall within the ambit of § 2254(d). Marshall v. Lonberger, 459 U.S. 422, 433-34, 103 S. Ct. 843, 850-51, 74 L.Ed.2d 646 (1983); McCoy v. Cabana, 794 F.2d 177, 182 (5th Cir. 1986); Armstead v. Maggio, 720 F.2d 894, 896 (5th Cir. 1983). Thus, for instance, the state court, after weighing the evidence, found that Juan Moreno had sufficient opportunity to view Cantu on the night of the shooting. Cantu, 738 S.W.2d at 253. As the state correctly observes, petitioner cannot avoid the binding effect of the state court findings merely by referring to snippets of testimony from a voluminous record. "One of the purposes of § 2254(d) was to prevent precisely this kind of parsing of trial court transcripts to create problems on collateral review where none were seen at trial." Wainwright v. Witt, 469 U.S. 412, 435, 105 S. Ct. 844, 858 (1984). Because § 2254(d) is controlling here, the district court properly relied on the presumption of correctness to reject Cantu's challenge to the state court factual findings on the identification issue.[17]

---

[17] Petitioner emphasizes that unlike its factual findings, the state court's legal conclusions are not entitled to the presumption of correctness. This is undoubtedly true, and indeed the state concedes as much. But it yields nothing more than a hollow victory for petitioner given that the district court applied the presumption of correctness only to the state court's factfindings and not to its legal conclusions.

21

## INEFFECTIVE ASSISTANCE

Petitioner asserts that his state trial and appellate counsel were constitutionally ineffective on several grounds. We review a claim of ineffective assistance of counsel at a capital sentencing trial under the familiar standards of Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984). As this court has recently noted:

> First, a defendant must show that "counsel's representation fell below an objective standard of reasonableness," with reasonableness judged under professional norms prevailing at the time counsel rendered assistance. Id. at 688, 104 S. Ct. at 2064. This is a standard which requires us to be "highly deferential," as it is extremely difficult for reviewing courts to place themselves in counsel's position and evaluate the choices he or she should have made. . . .
>
> Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S. Ct. at 2068. A court evaluating a claim of ineffective assistance need not address the reasonableness component first, and if a defendant fails on one part, it need not address the other. Id. at 697, 104 S. Ct. at 2069.

Black, 1992 WL 107848 at *5.

First, Cantu insists that his trial counsel erred during the guilt-innocence phase of the trial by failing to secure the services of an expert witness to contest the testimony of eyewitness Juan Moreno. According to Cantu, because no expert witness testified, "the jury was deprived of a way to intelligently

22

evaluate the testimony of Juan Moreno." This argument is specious. While petitioner is correct that the admission of expert testimony regarding eyewitness identifications is proper, see, e.g., United States v. Moore, 786 F.2d 1308, 1312-13 (5th Cir. 1986), he cites no authority to support the theory that his trial counsel was required to call an expert witness to challenge Moreno's testimony. Indeed, Cantu's trial counsel testified at the evidentiary hearing that he considered seeking the services of an expert witness on the issue of eye-witness identification but decided against it based on his belief that his cross-examination of Moreno would be sufficient to refute the accuracy of the identification.[18]

Petitioner next contends that his trial counsel was ineffective during the punishment phase. Counsel, he maintains, acted unprofessionally by failing to present evidence of Cantu's "low IQ, emotional immaturity, troubled youth, trauma as a result of his parents' divorce, and appearance of neglect." While counsel did not seek a psychiatric examination, nothing at the time of trial indicated that Cantu was insane when the offense occurred.[19]

---

[18]    Moreover, even had Cantu's counsel proffered an expert witness to testify on this issue, the trial court would have had discretion whether to admit such testimony. Pierce v. State, 777 S.W.2d 399, 414-16 (Tex. Crim. App. 1989), cert. denied, Pierce v. Texas, 496 U.S. 912, 110 S. Ct. 2603, 110 L.Ed.2d 283 (1990). The Texas rule is also consistent with federal practice. In Moore, we held that the decision whether to admit expert testimony "is squarely within the discretion of the trial judge," adding that "there is no federal authority for the proposition that such testimony must be admitted." 706 F.2d at 1312-13 (emphasis added).

[19]    Compare Bouchillon v. Collins, 907 F.2d 589, 597-98 (5th Cir. 1990) (Where defendant apprised his counsel of mental problems prior to plea hearing, counsel's failure to perform any

Moreover, Cantu's assertion that he was denied effective assistance of counsel by his attorney's failure to introduce evidence that he appeared to be a child who was either neglected or abandoned is specious. The evidence does not indicate that the petitioner was neglected or abandoned. At best, it shows he might have felt rejected and abandoned, which was assertedly manifested by the fact that he sometimes watched television until the early hours of the morning and engaged in fantasy. There is likewise no merit to petitioner's claim to have been traumatized by his parents' divorce or by his family's socio-economic background. Cantu's counsel thoroughly investigated these claims, consulting with his client as well as Cantu's father and brother for possible mitigating evidence. Counsel ultimately decided not to introduce this information because of his concern that the state would use it against his client. Introducing the testimony of family members would have allowed the state to cross-examine them about Cantu's reputation in the community, including both his membership in the Grey Eagles and his personal notoriety for theft, violence and drug use. Counsel was not incompetent in his approach to mitigating evidence.

Cantu also challenges his appellate counsel's representation as constitutionally deficient. Both the issues he

---

investigation whatsoever for a possible insanity defense violated Strickland); and Profitt v. Waldron, 831 F.2d 1245, 1248-49 (5th Cir. 1987) (counsel's failure to present an insanity defense, despite his knowledge that defendant had been previously adjudicated insane and had escaped from a mental institution at the time he committed the crime, held unreasonable).

24

faults appellate counsel for failing to raise -- a challenge to the constitutionality of the Texas Sentencing Statute and the trial court's refusal to charge the jury on the lesser included offense of voluntary manslaughter -- were raised and considered both on state habeas and in the present federal proceedings and were determined to be meritless. Because appellate counsel's effectiveness is judged by the same standard as that of trial counsel, see Sharp v. Puckett, 930 F.2d 450, 452 (5th Cir. 1991), petitioner's assertion, which fails even to allege that he was prejudiced by appellate counsel's performance, is frivolous.

## VI.

### LIMITATIONS ON PETITIONER'S TESTIMONY DURING THE PUNISHMENT PHASE

Petitioner did not testify at the guilt-innocence phase of his trial. However, his counsel attempted to call him as a witness during the punishment phase so that Cantu could testify on the limited issue of whether he shot Officer De La Luz in self-defense. The trial court refused to allow petitioner to testify on such a limited basis, ruling that if Cantu took the stand, he would be subject to cross-examination the same as any other witness. Petitioner then chose not to testify and offered a bill of exception, out of the presence of the jury, in which he testified that he shot Officer De La Luz in self-defense.

Petitioner now contends that the trial court's decision impermissibly chilled his right to present mitigating evidence. Specifically, petitioner challenges the Texas requirement that a defendant who testifies only at the punishment phase of the trial,

25

and who admits guilt during such testimony,[20] waives the right to challenge the sufficiency of the evidence as to guilt and waives any evidentiary objections made during the guilt-innocence phase. See, e.g., Brown v. State, 617 S.W.2d 234, 236 (Tex. Crim. App. 1981) (en banc). According to petitioner,

> Mr. Cantu was faced with a Hobson's choice at the punishment phase of his trial. Mr. Cantu could, on the one hand, testify at the punishment phase and risk waiving his substantial appellate issues as to the sufficiency of the evidence and the legality of the in-court identification; or, as he chose to do, allow the jury to impose sentence without the benefit of his version of the De La Luz shooting. . . .
>
> Because of Texas' peculiar procedural rule, Mr. Cantu's constitutionally protected right to present mitigating evidence in favor of a sentence less than death was unconstitutionally chilled.

The state argues that Cantu has waived this argument because it is raised for the first time on appeal, and we agree. See Buxton v. Collins, 879 F.2d 140, 148 (5th Cir. 1989), cert. denied, ____ U.S. ____, 110 S. Ct. 3295, 111 L.Ed.2d 803 (1990) (Penry claim may not be considered for the first time on appeal). In the alternative, petitioner is asking this court to announce and apply retroactively on collateral review what amounts to a new rule of constitutional law, a request foreclosed by Teague v. Lane, 489 U.S. 288, 109 S.

---

[20]    Cantu has never suggested that his testimony in the punishment phase would have admitted guilt.

Ct. 1060d, 103 L.Ed.2d 334 (1989).[21]  We decline to review this issue.

## VII.

## CONCLUSION

For the foregoing reasons, the judgment of the district court denying habeas relief is **AFFIRMED**.

---

[21]     While petitioner has not briefed the <u>Teague</u> issue, we agree with the state that none of the <u>Teague</u> exceptions apply here.